(No. 65382.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PAUL WEST, Appellant.

*Opinion filed May 30, 1990.—Rehearing denied October 1, 1990.*

Vincent Wagner, of Chicago, and Charles M. Schiedel, Deputy Defender, and Peter L. Rotskoff, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CALVO delivered the opinion of the court:

On February 27, 1986, an indictment was filed in the circuit court of Cook County charging defendant, Paul West, with the murder of three-month-old Shardae Harris under sections 9—1(a)(1) and (a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)). A jury found defendant guilty of murder on December 3, 1986, at the close of a three-day trial. The circuit court, however, granted defendant a new trial on January 15, 1987. On March 24, 1987, defendant was again found guilty as charged, following a bench trial. Pursuant to the State's request for a death penalty hearing, a sentencing hearing was commenced on April 28, 1987. On that day, a jury concluded defendant was eligible for the death penalty, finding that defendant was 18 years of age or older at the time of the offense (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) and that the aggravating factor

set forth in section 9—1(b)(3) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)) was present. The jury then heard and considered mitigating and aggravating evidence, ultimately concluding that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court, on May 14, 1987, sentenced defendant to death. The death sentence has been stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The issues presented for review are: (1) whether the circuit court properly denied defendant's motion to suppress his statements; (2) whether the State proved defendant guilty beyond a reasonable doubt; (3) whether defendant was denied effective assistance of counsel and due process of law with respect to choice of counsel; (4) whether the circuit court properly admitted the testimony of an examining psychiatrist at the sentencing hearing; (5) whether the prosecutor's closing argument at the sentencing hearing was proper; and (6) whether our death penalty statute is constitutional. We will address these issues after we chronicle the relevant facts of the case.

Prior to trial, on July 7 and August 14, 1986, defendant filed motions to suppress statements he had made to law enforcement authorities. Defendant's motions were heard on November 12, 1986.

Detective Thomas McCarthy of the Chicago police department testified that he and Detective Michael O'Sullivan interviewed defendant between 2 and 3 p.m. on January 30, 1986, while defendant was in custody at the Harrison Street police station. At the time he spoke with defendant, McCarthy was aware that Detectives Leuser and Pufpaf had previously interviewed defendant. McCarthy said he and O'Sullivan were assigned to the investigation of Shardae Harris' death at 9 a.m. on January 30, and, to the best of his knowledge, no one else spoke to defendant from the time McCarthy was assigned to the

case until Assistant State's Attorney Robert Babbitt spoke to defendant later that day. McCarthy and O'Sullivan were always simultaneously present during the interview, which lasted between 40 minutes and an hour.

At the outset, the officers apprised defendant of information they had obtained in the course of their investigation. They advised defendant of his constitutional rights, which he indicated he understood. McCarthy did not threaten defendant in any way, nor did anyone in his presence. Defendant did not request an attorney. After defendant gave an oral statement, McCarthy contacted Babbitt, who thereafter arrived at the station around 6 or 6:30 p.m.

Detective Michael O'Sullivan testified, essentially corroborating McCarthy's testimony. O'Sullivan denied that he or McCarthy told defendant what to say, threatened him or physically abused him. Following O'Sullivan's testimony, the State rested.

Defendant, Paul West, testified that he was arrested in a waiting room of Rush-Presbyterian-St. Luke's Hospital sometime after 8 p.m. on January 29, 1986, and was, forthwith, transported to the police station at Harrison and Kedzie where, he claimed, he was handcuffed to a wall in an interview room and left overnight. Defendant said the police did not give him food or water; he was, however, allowed to use the rest room around midnight.

The next time he saw a police officer was around noon on January 30. Two officers questioned him that afternoon: O'Sullivan was one of the two men; the other man, who had dark hair, was *not* McCarthy. The officers questioned him once, left, then returned and interrogated him again. They did not threaten or physically abuse him in the first interview, nor did they read him his rights.

In the second interview, defendant reiterated his initial statement. According to defendant, the dark-haired officer then slapped him twice and said, "We are going to go

over this again." During this physical abuse, O'Sullivan sat and watched. About 10 minutes later, O'Sullivan said, "I want to hear what you have to say." Defendant said he repeated his initial statement three times before O'Sullivan threatened him and told him what O'Sullivan wanted him to say. Defendant claimed O'Sullivan intimidated him by telling him he might "get shot" if he tried to escape. Defendant changed his story because he was frightened. The signed statement which he ultimately gave to Assistant State's Attorney Babbitt was not true.

On cross-examination, defendant acknowledged he had not *asked* for food or water during his first night at the police station; whereas, he *had* asked to go to the bathroom. Although he maintained his signed statement was untrue and coerced by intimidation, he did not tell Babbitt he had been threatened and abused. In fact, Babbitt asked defendant if he had been treated well by police, to which defendant responded affirmatively. When defendant signed the statement, he did not tell Babbitt that O'Sullivan had made him memorize it. Defendant denied that Babbitt had explained he was an assistant State's Attorney, not defendant's attorney, and that he had told Babbitt he did not want a lawyer. According to defendant, Babbitt said only that he was "an attorney." Defendant admitted he knew what a public defender was, and did not ask for one. Defendant explained he had not told Babbitt about the coercion of the police because he was afraid of an officer who was present.

Following defendant's testimony, two stipulations were noted for the record. If Robert Babbitt had been called to testify he would have said he was an assistant State's Attorney who, on January 30, 1986, met with defendant and advised him of Babbitt's capacity as an assistant State's Attorney and that defendant was the subject of the investigation. Babbitt then asked defendant questions which, along with defendant's answers, were transcribed by a

court reporter. Had Annette Faklis been called as a witness, she would have testified that she transcribed the conversation between Babbitt and defendant. The first question asked of defendant was: "Now, Paul, I talked to you earlier, and I explained that I am an Assistant State's Attorney and not your attorney, is that correct?" Defendant responded, "Yes."

Detective O'Sullivan was recalled on behalf of the State. O'Sullivan testified that he and McCarthy were always simultaneously present in the interview room with defendant. He never questioned defendant with a dark-haired officer who slapped defendant. He did not make defendant memorize the contents of defendant's signed statement.

Defendant's motions to suppress were denied, as were his motion to declare the Illinois death penalty statute unconstitutional and his request for counsel other than his appointed counsel, Assistant Public Defender Michael King.

Defendant's jury trial commenced December 1, 1986. On the first day of trial, defendant presented a formal motion for appointment of counsel other than the public defender. Defendant demonstrated no grounds warranting substitution of counsel. The allegations in defendant's motion concerning lack of consultation with counsel were denied by Assistant Public Defender King. Counsel noted several occasions when he attempted to consult with defendant, but defendant refused to meet with him. Defendant's motion was denied. Thereafter, the trial proceeded, concluding on December 3, 1986, when the jury found defendant guilty of the murder of Shardae Harris.

Defendant filed a motion for a new trial on January 7, 1987. The motion was heard and argued over several court settings commencing January 7. It was ultimately granted on January 15, 1987.

Prior to retrial, defendant presented yet another motion for appointment of counsel other than the public defender. Defendant's motion was presented and denied on February 24, 1987, at which time defendant acknowledged he had "a good lawyer." On March 23, 1987, defendant waived a jury for purposes of the adjudicatory phase of retrial, which began on March 24, 1987.

Shirley Harris testified that she moved in with defendant on Thursday, January 23, 1986. At that time, she did not have her baby, Shardae, with her. On Friday, January 24, she brought her three-month-old baby to live with her in defendant's two-story apartment building. Defendant was not the father of her baby.

Ms. Harris said she left the apartment for about an hour on Saturday, January 25, 1986. When she returned, she found defendant at the residence with the baby and noticed bruises on the baby's back. When she asked defendant about the bruises, defendant told her a man had come into the house and had beaten Shardae.

On January 27, 1986, she noticed more bruises on the baby's chest. She again brought the matter to defendant's attention. Defendant told her the baby would be all right. When she indicated she wanted to take Shardae to a clinic, defendant said "they" would "put [her] away" if she did.

Ms. Harris said she went to school on Wednesday, January 29, 1986, and when she returned Shardae appeared to be in good health, except for the bruises previously noted. Later in the evening, she and defendant went "upstairs" to prepare dinner; the baby remained "downstairs." At some point in time, defendant went downstairs to get a cigarette; he was gone approximately 20 minutes. After defendant returned, they had dinner, cleaned up, then went back downstairs. They had been upstairs at least an hour.

When they got downstairs, Ms. Harris found her baby dead: one eye open, one eye closed, lying in a chair. She picked the baby up and asked defendant to take them to a hospital. Defendant refused, saying they were going to "sit down and plan this." He suggested they bury the baby in the backyard and say she had been kidnapped. Harris refused. Defendant kept telling Harris "they" would "put [her] away."

Harris was eventually able to get to the hospital by agreeing to tell the nurses the baby had died of pneumonia and had fallen out of bed. Defendant walked with her to Rush-Presbyterian-St. Luke's Hospital. When she arrived at the hospital, she told the first doctor she saw that defendant had killed her baby. Later, she accompanied police officers and another doctor to defendant's residence to examine the scene of Shardae's death.

On cross-examination, Ms. Harris testified she went alone to visit Shirley Gleeson on Saturday, January 25. She denied ever telling defendant she did not want Shardae.

Detective Raymond Leuser of the Chicago police department testified that he was working with Detective Thomas Pufpaf on January 29, 1986, when they received a call from Rush-Presbyterian-St. Luke's Hospital regarding a homicide. They responded and, upon their arrival, spoke with hospital personnel and other police officers who were present. They viewed the body of Shardae Harris. The detectives thereafter interviewed Shirley Harris, then defendant. At the conclusion of their preliminary investigation, they transported defendant to "Area 4 Violent Crimes," where they advised him of his constitutional rights prior to speaking with him further.

Defendant indicated he understood his rights and agreed to talk to them. He told them he and his girlfriend had gone out to visit friends, leaving the baby at home, and, when they returned, he observed the injuries to

Shardae. Defendant speculated that someone must have come into the building and injured the baby. Defendant denied injuring the baby.

Detective Thomas McCarthy of the Chicago police department testified that he became involved in the homicide investigation on January 30, 1986. Defendant and Shirley Harris were already at the police station. He was aware defendant had given a statement and of the substance of that statement. After he spoke with Shirley Harris, he proceeded to defendant's residence, where he checked for signs of forcible entry, and found none.

McCarthy then spoke with Dr. Lifschultz, who had performed an autopsy on the body of Shardae Harris. Subsequent to that interview, McCarthy proceeded to Shirley Harris' mother's residence. The elder Ms. Harris agreed to accompany McCarthy to the police station in order to be present during an interview of her 16-year-old daughter, Shirley. McCarthy advised Shirley Harris of the nature of the baby's injuries and that the doctor had classified the case as a homicide. McCarthy obtained additional information from Shirley Harris and thereafter spoke again with defendant.

McCarthy initially advised defendant of his rights, which defendant indicated he understood. McCarthy then informed defendant of the conversation he had had with Dr. Lifschultz regarding the cause of the baby's death. Defendant responded by making an oral statement which differed from his first version of events. McCarthy called "Felony Review" for an assistant State's Attorney.

Assistant State's Attorney Robert Babbitt arrived at the station approximately one hour later and spoke with Shirley Harris, then defendant. After a conversation between McCarthy, Babbitt and defendant, a court reporter was called. When the court reporter arrived, defendant was interrogated in her presence and she recorded Babbitt's questions and defendant's answers.

McCarthy said that around 2:30 or 3 p.m. on January 30, he, the medical examiner, and Shirley Harris went to defendant's residence, where the medical examiner observed the scene of the baby's death.

Defendant's statement was submitted for the court's examination. In his statement, defendant admitted striking the baby on Saturday, January 25, in an effort to "calm her down." Defendant said he hit Shardae on the back "two or three times" with a leather belt. He stated that, on January 29, 1986, he and Ms. Harris were upstairs in the apartment and, at some point, he went downstairs to get a cigarette. The baby was downstairs crying. Because she was "irritating" him and "getting on [his] nerves," defendant picked her up and shook her to "calm her down." In so doing, defendant hit her head on a dresser, then, still shaking her, he dropped her on the floor. When he picked her up and put her on a couch, he noticed she was coughing and gagging. He said he was scared and did not know what to tell Harris, so he went back upstairs, and did not tell her anything. Later, according to defendant, they came downstairs and were watching television when Harris heard the baby coughing and went to check on her. Defendant said Harris attempted to resuscitate the baby when she realized the baby was not breathing. The effort failed and they subsequently took the baby to the hospital.

Following McCarthy's testimony, it was stipulated that Dr. Barry Lifschultz, of the Cook County medical examiner's office, would testify as he had on December 3, 1986, at defendant's first trial. At the first trial, Lifschultz, a forensic pathologist, testified that he performed an autopsy on the body of Shardae Harris on January 30, 1986. Lifschultz first noted external injuries: three bruises on the face in the cheek area; three abrasions near the mouth; a bruise behind the left ear and an abrasion on the back of the neck; eight bruises and an

abrasion on the back of the left hand; five abrasions and five bruises on the back of the right hand; one abrasion and four bruises on the palm of the left hand; one abrasion and 10 bruises on the palm of the right hand; one abrasion on the remainder of the left arm and one abrasion on the remainder of the right arm; four bruises and two abrasions on the left leg; six bruises and two abrasions on the right leg; and four abrasions and three bruises on the back. Of the external injuries he noted, Lifschultz said he was unable to determine whether seven injuries were burns or whether they were abrasions. These injuries included one on the left knee, two on the chest, and four on the back. Lifschultz noted two internal injuries: a fractured skull, resulting in hemorrhaging over the surface of the brain; and a lacerated liver.

The fractured skull and lacerated liver appeared to have been caused by the application of blunt force. Lifschultz believed Shardae Harris died as a result of the two internal injuries. Lifschultz said the external chest injuries could have been four or five days old, or as old as two weeks. The internal injuries were definitely not two weeks old; they had been recently inflicted.

After Lifschultz examined Shardae's body, he went with police to the scene where the injuries were alleged to have occurred. Noting the carpet on the floor, Lifschultz testified the baby's lacerated liver could not have resulted from a fall from defendant's arms. Lifschultz said a light bump on the baby's head could not have caused the skull fracture. While at the apartment, Lifschultz recovered a cigarette lighter, the wheel of which bore a pattern similar to that of injuries Lifschultz had observed on the baby's body. At the conclusion of Lifschultz' testimony, the State rested.

At the outset of defendant's case, it was stipulated that Shirley Gleeson would have testified, if called, as she did on December 3, 1986, at defendant's first trial. A

transcript of her testimony was presented for the court's perusal. Gleeson had previously testified that *both* Shirley Harris and defendant came to visit her around 10 p.m. on January 25, 1986, stayed no more than 5 or 10 minutes, and then left.

Defendant, 27-year-old Paul West, took the stand on his own behalf. Defendant testified that Shirley Harris brought her baby to his residence on January 25, 1986. He told her she could. stay with him only if she stayed with the baby because there would be no one there to look after Shardae. Harris agreed. He and Harris visited Ms. Gleeson around 10 p.m. that evening. They returned around 10:30 p.m. From that time until the morning of January 29, Ms. Harris did not, to his knowledge, leave his apartment.

On the morning of January 29, defendant walked Shirley Harris part of the way to school. He then went to his father's house to check on some dogs; whereafter, he returned home, arriving at approximately 12:50 p.m. Harris had not returned, but did 10 minutes later. They watched television that afternoon, after which defendant went upstairs to prepare dinner. Defendant said when he came back downstairs, Harris was holding the baby in her arms. He repeatedly asked her what was wrong with Shardae, who was coughing and gagging. He told her they would have to take the baby to the hospital. He denied telling Harris they should bury the baby in the backyard. According to defendant, he told Harris she would be placed in a mental institution for what she had done to the baby. Defendant claimed Harris had previously told him, in May of 1985, that she did not want the baby. Defendant walked to the hospital with Ms. Harris.

At the hospital, the police arrested him and transported him to the police station at Harrison and Kedzie. He told the police he did not know what had happened to the baby. He was placed in an interview room, where he

was handcuffed to the wall and left until the next day. When he was again questioned by police, they ignored his request for an attorney and physically mistreated him, striking him in the chest, stomach and eye. Detectives Leuser and McCarthy were the officers who mistreated him. Defendant claimed they told him what he was to say to the assistant State's Attorney when he arrived. Defendant did as he was told and signed the resulting statement. On the last page of the statement, he insisted upon changing, "Have any promises or threats been made to you in order to give this statement?" to "Have I made any promises or threats to you in order for you to give this statement?" Defendant said the assistant State's Attorney who questioned him had not mistreated him.

Under cross-examination, defendant denied ever striking the baby. He testified he had seen no injuries on the baby when he allegedly told Ms. Harris she would be institutionalized for her conduct. He had seen only the look on Harris' face and had heard the baby gagging or coughing.

Defendant maintained he memorized what the police wanted him to say and expounded on it in his seven-page statement; however, the whole thing was "fabrication." Defendant said the assistant State's Attorney *said* he was a State's Attorney and that the officers hit him in the face once, not twice. When confronted with his suppression testimony, defendant admitted he never specifically mentioned being struck in the chest or stomach. He speculated that Shirley Harris had been abusing the baby before she moved in with him and, knowing that he had previously been incarcerated, planned to implicate him in the death of the infant.

On redirect, defendant testified that he saw bruises "all over" the baby's body while Harris was holding her. He said he had seen the baby earlier that day and saw no bruises at that time. He did not implicate Harris at the

hospital because, although he knew the baby had been injured, he "didn't think *** Shirley would have done anything like that."

Following defendant's testimony, it was stipulated that Dr. Sandra Turner would have testified, if called, that she was on duty at Rush-Presbyterian-St. Luke's Hospital on January 29, 1986, and examined Shardae Harris. She did not recall, nor did her notes reflect, that Shirley Harris told her defendant had killed the baby. The only pertinent statement in her notes was that given by defendant, who told her the baby fell out of bed. With the stipulation, defendant concluded his case.

In rebuttal, the State offered a certified statement of defendant's 1978 murder conviction as impeachment.

The court found defendant guilty of murder on March 24, 1987. The State requested a death penalty hearing and, in order to allow defendant time to decide whether to proceed with or without a jury, the case was continued to March 26, 1987.

On March 26, 1987, defendant insisted on a jury for sentencing, rejecting his counsel's advice on the matter. Assistant Public Defender King asked for clinical examination of defendant, complaining that defendant seemed "unable to cooperate with counsel, this particular counsel." The court noted defendant had been lucid throughout the proceedings. The court suggested defendant bring in co-counsel if he so desired; however, the court made it clear that it would allow no further delay. Jury selection was set for March 27, 1987.

On March 27, 1987, defendant, through King, moved for a continuance so that defendant could undergo a psychiatric examination to determine whether he was capable of cooperating with counsel and whether he was afflicted with "some mental disease or illness" which might serve as mitigation at sentencing. Pursuant to defendant's re-

quest, the psychiatric examination was ordered, and the case was continued to April 20, 1987.

On April 22, 1987, the case was called for hearing on defendant's motion for a new trial and, in the event of denial, for sentencing. Defendant's parents were present and indicated, through Assistant Public Defender King, that they were in the process of retaining attorney Earl Washington for defendant. The court stated that private counsel could enter the case as co-counsel, but the case would proceed the next day, April 23.

On April 23, defendant informed the court that he did not want to be represented by Assistant Public Defender King, and that his family was retaining counsel for him. A dialogue ensued wherein defendant twice reiterated his position and the court, equally adamant, first advised defendant that he would proceed with King, whether or not defendant retained private counsel, then offered defendant the option of representing himself. Defendant's father apprised the court that he was indeed attempting to retain an attorney—Mr. Benson—and that the attorney was supposed to have appeared, but had failed to do so. The court adjourned for the day to allow Mr. Benson to appear, but refused to grant defendant a further continuance.

On April 24, 1987, Vincent Wagner appeared on behalf of defendant and moved for a continuance to May 25, 1987, to enable him "to become familiar with the facts and issues in the case." The court allowed Wagner to enter his appearance, but denied the motion for continuance and informed Wagner that the assistant public defender would not be excused and would be "available to" Wagner when jury selection commenced on Monday, April 27.

On April 27, 1987, Wagner apprised the court that defendant had still not decided upon a jury or bench procedure for sentencing, despite Wagner's explanation of the tactical considerations involved. The court informed

defendant jury selection would begin at 11:15 a.m. and he could make his decision in the intervening time.

When the case was recalled, argument was waived on defendant's motion for new trial, which the court then denied. Wagner again asked for a continuance to acquaint himself with the record, noting that defendant still had not decided upon a bench or jury procedure and that communication between Assistant Public Defender King and defendant had "totally broken down" and, as a result, defendant would be denied effective assistance of counsel if he were forced to proceed. King told the court the breakdown in communication was unilateral: King could communicate with defendant, but defendant would not, or could not, communicate with King. The court denied defendant's motion for a continuance and brought in prospective jurors for *voir dire*.

Defendant then asked to make a statement to the court outside the presence of prospective jurors. When allowed to do so, defendant asked for a 30-day continuance and stated he would "consider taking a bench" trial. The court told defendant the case would proceed with King and Wagner as co-counsel and defendant could waive a jury if he wished to, but barring waiver, jury selection would begin forthwith pursuant to defendant's original choice. Defendant stated he had not decided, he had not had time to discuss his options with his lawyers, and he had "nothing further to say."

After jury selection commenced, King informed the court defendant was still considering jury waiver, and asked if the court would still accept a waiver and, further, if the court would accept a waiver, whether the court would have "any notions as to what might be the ultimate [sentencing] disposition if [defendant] were to waive." The court refused to commit itself, telling defendant he could waive or not as he wished. After a brief interval, the

court advised defendant it would no longer accept a jury waiver.

After jury selection was concluded, the sentencing hearing began and evidence was adduced by the State for purposes of the first stage of sentencing. Detective McCarthy testified that he was present in court on February 23, 1978, when defendant pled guilty to the murder of Gladys Jones, and was present on March 24, 1987, when defendant was found guilty of the murder of Shardae Harris. McCarthy identified a copy of defendant's birth certificate, which indicated he was born on January 1, 1959, and a certified statement of conviction evincing defendant's conviction for the Jones murder. Thereafter, it was stipulated that Linda Mason, a court reporter, would have testified, if called, that defendant previously testified on March 24, 1987, at which time he said he was 27 years old. It was further stipulated that Richard Kurz, of the office of the Cook County circuit clerk, would have testified defendant had been found guilty of the murder of Shardae Harris on March 24, 1987. The State rested for purposes of the eligibility phase.

The jury unanimously found the existence of the requisite factors in sections 9—1(b) and 9—1(b)(3) of the death penalty statute (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(b), (b)(3)), thus qualifying defendant for the death penalty. The court proceeded to the second stage of the death penalty hearing.

In the course of opening statement, defense counsel told the jury:

> "You will see and there will be—they'll [witnesses will] depict one of the simplest minded men that ever walked the face of the earth. A man who while grown man [sic], adult, twenty-seven year old man, a man who has about a second grade mentality, if that. Perhaps a fourth grade. Four year old's mentality.

I submit to you the Judge will ultimately and has instructed you that if you find that there is some sort of emotional disturbance, not sufficient to be insanity defense [*sic*], but if you find that the defendant has such emotional disturbance, emotional problems, mental problems, weak mind, that that is a sufficient—significant and sufficient mitigating factor in his case.

You will hear, as I say, child like evasions that came from Paul West. Child like rationalizations. I submit to you ultimately, will be [*sic*] your decision. Ultimately will be your collective wisdom that will determine this case. But I submit to you and I defy you now or ever to suggest that I'm wrong about his mentality. It is—it would—there has [*sic*] to be laws to protect people like Shardae Harris. No problem with that. I'm certainly not for what's happened in her life and this other girl, Gladys' life. But there are laws that also protect the feeble minded.

\* \* \*

You're going to hear some stories that you're going to think this guy probably got [*sic*] a single digit IQ. And that's in fact what the case is.

I'd ask you to listen to all the evidence and I'm convinced that if you do, you will find that this man suffers from mental and emotional problems that are sufficient to preclude the death penalty.''

The first witness in the second phase of sentencing was John Lackonitz, a police officer with the City of Chicago. On December 28, 1976, Lackonitz responded to a call concerning an alleged attempted armed robbery of Gladys Jones, a minor. Jones told Lackonitz defendant had approached her and demanded $55. When she told defendant she did not have the money, defendant pulled out a revolver, grabbed her by the arm, and started dragging her to an empty lot. Defendant hit her in the face with the revolver and told her he was going to shoot her. Jones said she was crying and pleading for her life. Defendant then told her he would take her to a nearby building and throw her out of a window if she did not

give him $55. Lackonitz observed facial bruises and marks on Jones' face. He wrote up a report and turned the investigation over to detectives.

Gregory McHough of the Chicago police department testified that he became involved in the Jones case in December of 1976 and ultimately arrested defendant, who was charged with battery. An appearance date was set for January 18, 1977. On January 15, Gladys Jones' mother reported her missing. Gladys Jones failed to appear in court on January 18. On that date, defendant was returned to the police station at Harrison and Kedzie for questioning.

McHough apparently suspected defendant was responsible for Jones' disappearance. A boy named William Palmer had previously informed McHough that defendant had approached Palmer on the day of Jones' disappearance and offered him money to get Jones to come out of her apartment. Defendant had told Palmer not to tell Jones it was defendant who wanted to see her.

When questioned by McHough, defendant refused to say whether he knew of Jones' whereabouts. The investigation continued. Jones' girl friends told McHough defendant used to take Jones to an abandoned building, somewhere around the Chicago Stadium, where he would have sex with her. McHough and other officers searched approximately 25 abandoned buildings in the area, to no avail. About one month later, Jones' body was found in an abandoned building.

Richard Walton, a Chicago police officer, testified that he responded to a call on February 15, 1977, concerning a body that had been discovered in an abandoned building at 2046 West Monroe. In a closet inside the building, Walton found the body of a black female in an inverted position, clad only in a pair of knee-high socks and a skirt which was pulled up to her waist. He found a torn blouse

and a torn bra nearby. He later learned the body was that of Gladys Jones.

Phillip Ducar of the Chicago police department testified that he investigated Gladys Jones' homicide. Vaginal swabs revealed the presence of sperm in Gladys Jones' vagina. Death was due to strangulation. Ducar eventually arrested defendant. Initially, defendant denied any involvement. Later, defendant stated, "It was an accident." Then, on February 16, 1977, Ducar spoke with Investigator Thomas Munion. Munion told Ducar that Munion had had conversations with defendant on January 18 wherein defendant asked what it would be like to be executed in the electric chair and if he could be charged with murder even if the police did not locate the body of the victim for six months and found no fingerprints at the scene. Defendant told Munion he believed he could not be convicted of murder unless three persons testified against him. Also present during the conversation were defendant's mother and Gladys Jones' mother.

Patrick Foley, a detective with the City of Chicago, testified that, in September of 1977, he investigated the alleged armed robbery of Mathew . Jones—Gladys' brother—by defendant. According to Jones, defendant asked him to buy defendant a pack of cigarettes. When Jones refused, defendant said, "You want to be strangled?" Defendant then removed money from Jones' pockets. The robbery charge was dropped when defendant pled guilty to the murder of Ms. Jones.

Shirley Harris testified that she told hospital personnel, and later the police, that defendant had killed her baby. An outburst by defendant during Harris' testimony was followed by certain testimony regarding dates and times which might be considered inconsistent with portions of Harris' trial testimony. Upon regaining her composure, Harris corrected some of her earlier responses, making them consistent with her prior testimony.

Detective Thomas McCarthy testified that he spoke with Detectives Leuser and Pufpaf when he first became involved in the Shardae Harris homicide investigation. The detectives told McCarthy defendant had told them an intruder must have injured Shardae; however, McCarthy found no evidence of forcible entry at the scene of the homicide. McCarthy read aloud defendant's signed statement.

Dr. Barry Lifschultz testified consistently with his trial testimony as regards the extent of Shardae's injuries. Dr. Lifschultz believed the extensive injuries he observed were not consistent with defendant's explanation of events, but *were* consistent with a beating. On cross-examination, the doctor allowed that a fall could have caused a linear skull fracture and that a fall might also have caused a lacerated liver if a man six feet tall had been holding the baby over his head. The doctor noted that the 44 bruises and 15 abrasions he observed had been recently inflicted and had not begun to heal.

Cameron Forbes testified that he was a records office supervisor for the Illinois Department of Corrections at the Joliet Correctional Center while defendant was housed there from March 31, 1978, to November 24, 1980. During defendant's stay at Joliet, defendant committed 25 separate violations of inmate rules. For example, on April 17, 1979, defendant received a violation report for fighting. On October 22, 1980, he received a violation report for "pressuring fellow inmates," through threat or actual use of force, to surrender their commissary items. Because of numerous disciplinary infractions, defendant was twice recommended for transfer to a more secure correctional institution. On October 5, 1978, a transfer was recommended to the Stateville correctional facility, which recommendation was never effected; however, on November 30, 1980, a transfer was recommended to the Pontiac Correctional Center, and defend-

ant *was* subsequently transferred to Pontiac. While at Pontiac, defendant was involved in a gang-related disturbance. Defendant had armed himself with a shovel. He was told to drop the shovel, but refused. He was eventually disarmed by another inmate. Defendant was once returned as a parole violator after having been released.

Dr. Gerson Kaplan, a psychiatrist, testified that he spoke to and evaluated defendant on July 1, 1986, and again on April 14, 1987. Kaplan rated defendant's intelligence between average and bright average for a man of his age. Kaplan estimated defendant's IQ to be 110. The State rested.

The defense called the Reverend Archie West, defendant's father. Reverend West testified that he did roofing, plastering and plumbing work and defendant helped him on the jobs. West said defendant was a good worker, had always helped around the house, and had a paper route at age eight. Defendant never had a behavioral problem. He attended church functions regularly. He cared for his grandmother for a time without compensation, and tried to keep his younger brothers from getting involved with gangs. Reverend West asked the jury to spare his son's life. On cross-examination, Reverend West admitted he had not been around his son much in the preceding 10 years and that defendant's heightened interest in religious matters had come about subsequent to his arrest.

In closing arguments, the State suggested defendant had raped Gladys Jones; defense counsel claimed Jones was a "willing participant in whatever was going on there." Defense counsel returned to the "feeble-minded" characterization of defendant that he had employed in his opening statement. In rebuttal, the prosecutor invited the jurors to look at the photographs of Gladys Jones' body and decide for themselves whether Jones had been a willing participant in sexual intercourse; he suggested defend-

ant's conduct was not consistent with a feeble-minded person.

The jury subsequently concluded there were no mitigating factors sufficient to preclude the imposition of the death penalty.

The defendant's motion for a new trial was heard and denied on May 14, 1987. Shortly thereafter, the court imposed the death penalty.

On appeal, defendant initially contends that the circuit court erred when it denied suppression of his statements which, he alleges, were coerced by police misconduct and given in ignorance of his constitutional rights. The central issue before the circuit court was one of credibility: if the court believed the officers who testified, defendant's constitutional rights were honored and his statements were voluntary; if, however, the court found defendant's version of events credible, defendant's rights were violated and suppression would have been indicated. The court obviously found the officers, not defendant, credible. Generally speaking, a court of review should not encroach upon the trier of fact's function of weighing credibility. (*People v. Morgan* (1986), 112 Ill. 2d 111, 136.) Having carefully reviewed the evidence, including relevant trial testimony (see *People v. King* (1986), 109 Ill. 2d 514, 525), we believe the circuit court's determination that defendant's statements were voluntary is not contrary to the manifest weight of the evidence and is, therefore, not subject to reversal. See *People v. Terrell* (1989), 132 Ill. 2d 178, 198; *People v. Rogers* (1988), 123 Ill. 2d 487, 495.

Inconsistencies in defendant's testimony reflect adversely upon his credibility. At the suppression hearing, defendant testified that Detective O'Sullivan and an unidentified dark-haired officer threatened and mistreated him, respectively. According to defendant, Detective McCarthy was *not* one of the officers involved. At trial, defendant testified McCarthy and Leuser were the two

officers who mistreated him. In his initial account of the alleged physical abuse, defendant said he was slapped twice in the eye. At trial, defendant said he was struck in the eye, chest and stomach. Although defendant claimed he had been mistreated, when Babbitt asked him if the police had treated him well, defendant said they had. Defendant could have made any abuse a matter of record at that time, if indeed any abuse had occurred. Defendant also claimed, during the suppression hearing, that Babbitt had failed to inform him Babbitt was an assistant State's Attorney. Thereafter, it was stipulated that the court reporter who transcribed the conversation between Babbitt and defendant would have testified Babbitt *did* inform defendant that he was an assistant State's Attorney, and not defendant's attorney. In view of the foregoing, we cannot say the court was without a basis for finding the officers more credible than defendant; nor can we find the court's determination regarding voluntariness was against the manifest weight of the evidence.

Defendant next contends he was not proved guilty of murder beyond a reasonable doubt. In addressing this contention, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Eyler* (1989), 133 Ill. 2d.173, 191; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) It is not our function to retry defendant. *Eyler*, 133 Ill. 2d at 191.

In his signed statement, defendant admitted striking three-month-old Shardae with a belt on Saturday, January 25, 1986, professedly to "calm her down." These blows were inflicted with sufficient force to bruise the baby's back. Defendant also admitted shaking Shardae on January 29 because her crying was irritating him. While engaged in this activity—which defendant again claims was undertaken to "calm her down"—defendant said she hit

her head on a dresser, then fell to the floor. He admits she was coughing and gagging when he picked her up and he was "scared" because of her condition, but he then returned to his dinner and took no steps to obtain emergency medical assistance for the baby.

Shirley Harris testified that she first noticed bruises on the baby's back after she had returned home on January 25, the same day defendant said he struck the child. At that time, defendant was alone with Shardae. When Harris asked defendant about the bruises, defendant told her a man had come into the house and beaten the baby. She came home from school on January 29 to find Shardae in apparent good health, other than the bruises previously noted. She and defendant went upstairs to prepare dinner. At one point, defendant went downstairs to get a cigarette and was gone approximately 20 minutes. Not long after she returned downstairs, Harris found Shardae dead. Again, Harris' testimony was substantially corroborated by defendant's statement. Harris then testified that defendant refused her requests to take her to the hospital, saying they were going to "sit down and plan this." He suggested they bury the baby in the backyard and say she had been kidnapped. Harris eventually got to the hospital by agreeing to tell hospital personnel the baby had died of pneumonia and had fallen out of bed.

When Dr. Lifschultz performed the autopsy on Shardae's body, he noted 44 bruises and 15 abrasions, all recently inflicted. He noted two life-threatening injuries: a fractured skull and a lacerated liver.

We find this testimony sufficient to support defendant's conviction. Intent to kill may be inferred from the character of defendant's acts and the circumstances surrounding the commission of the offense. (*People v. Garcia* (1983), 97 Ill. 2d 58, 85.) Defendant is presumed to intend the natural and probable consequences of his acts, and evidence that the defendant committed a voluntary and will-

ful act which has the natural tendency to cause death or great bodily harm is sufficient to prove the intent required for the offense of murder. (*Terrell*, 132 Ill. 2d at 204; *People v. Foster* (1987), 119 Ill. 2d 69, 88.) In the foregoing context, great disparity in size and strength between the defendant and the victim is properly considered. (*Terrell*, 132 Ill. 2d at 204; *People v. Brackett* (1987), 117 Ill. 2d 170, 180.) Evidence of defendant's prior acts of violence toward a victim has been admitted as proof of the defendant's intent at the time of the commission of the offense charged. *People v. McCarthy* (1989), 132 Ill. 2d 331, 344.

With these principles in mind, we return to the facts in evidence. Ignoring for the moment defendant's self-serving characterization of his actions as attempts to "calm the baby down," it is clear from defendant's statement he engaged in acts of violence toward the victim on January 25, four days prior to the baby's death. As we noted in *McCarthy*, defendant's actions can be considered on the issue of intent. Moreover, the great disparity in size between the defendant and the three-month-old victim militates against any suggestion that defendant did not intend the consequences of his actions. A three-month-old baby is a relatively fragile being. A full-grown man who violently shakes such an infant cannot help but be aware that his actions create a strong probability of great bodily harm or even death. Any reasonable person would know such an action would not calm the baby, barring serious injury. Moreover, by defendant's statements, it is clear he realized he had seriously injured the child to a degree that emergency medical assistance was indicated; yet he did nothing to secure such assistance, nor did he advise Shardae's mother of her condition.

The extent of Shardae's injuries admits of only one conclusion: she was subjected to a severe beating or beatings. The nature of the infant's injuries and the deliberate

force needed to cause them negate any suggestion that the injuries were not intentionally inflicted. (See *Terrell*, 132 Ill. 2d at 205.) The defendant's signed statement does not account for all of the numerous bruises noted over a substantial area of Shardae's body, but does implicate him in the infliction of at least some of those injuries. Harris also implicated defendant. Although defendant testified at trial, implicating Harris in the murder, the trial judge, charged as he was with the task of determining the credibility of witnesses and resolving conflicts in the evidence (see *People v. Slim* (1989), 127 Ill. 2d 302, 307), apparently did not believe defendant. A trier of fact could reasonably infer that defendant was responsible for the conduct which caused Shardae's extensive injuries and that defendant was aware his actions created a strong probability of great bodily harm or death. The evidence was sufficient to prove defendant guilty of murder beyond a reasonable doubt.

We now turn to defendant's contention that he was denied effective assistance of counsel and due process of law with respect to choice of counsel. Defendant's claim of error is twofold: first, he was forced to trial with a lawyer not of his choosing; second, once he retained an attorney, the court denied defendant a continuance to allow counsel an opportunity to familiarize himself with the record. Defendant cites *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, for the proposition that "[a] lawyer not of his own choosing cannot be forced upon him." While this proposition is, very broadly speaking, true, *Faretta* would not allow an indigent defendant to choose any attorney he wished; rather, it would allow a defendant to represent himself if he so desires. Defendant cites *People v. Knippenberg* (1977), 66 Ill. 2d 276, for the expansive proposition that a "person is entitled to an attorney of his own choice." Our reading of *Knippenberg*

discloses no such statement in that case, which dealt with the attorney-client privilege.

Although the sixth amendment guarantees an accused the right to assistance of counsel in a trial for certain crimes, it does not include the right to select counsel of choice, particularly where the exercise of that claimed right would delay or impede the effective administration of justice. (*People v. Barrow* (1989), 133 Ill. 2d 226, 252; *People v. Hall* (1986), 114 Ill. 2d 376, 403.) A defendant has the right to be represented by *retained* counsel of his own choosing (*People v. Johnson* (1979), 75 Ill. 2d 180, 185); however, he does not have the right to choose *appointed* counsel (*People v. Lewis* (1981), 88 Ill. 2d 129, 160). We see nothing of record that would indicate defendant was inadequately represented by Assistant Public Defender King or that he was unable to cooperate and communicate with King. Defendant's unwillingness to cooperate is hardly a reason for a change of appointed counsel. Defendant was offered, but rejected, the option of self-representation. No right with respect to choice of counsel was infringed.

Moreover, we hold that the circuit court did not deny defendant effective assistance of counsel *or* due process of law when it allowed retained counsel, Mr. Wagner, to enter his appearance on defendant's behalf, but denied a motion for continuance. As early as March 26, 1987, the court informed defendant he could bring in co-counsel if he so desired, but the court would tolerate no further delay of the case. On April 22, 1987, when the case was called for a hearing on defendant's motion for a new trial, and for sentencing, defendant had not yet procured counsel; however, Assistant Public Defender King indicated defendant's parents were in the process of retaining Earl Washington. The cause was set over to the next day. On April 23, defendant had not retained counsel. Mr. Benson was supposed to have appeared on defendant's behalf, but

did not. The court refused a continuance; however, the matter was again set over to the following day.

On April 24, Vincent Wagner appeared on defendant's behalf, requesting a continuance, which request was denied. The cause was set over until April 27, 1987. On that date, yet another request for a continuance was denied and defendant proceeded to the sentencing phase represented by both Wagner and King.

This court addressed factually similar circumstances in *People v. Friedman* (1980), 79 Ill. 2d 341. In *Friedman,* the trial court had informed defendant 2½ months prior to trial that defendant was free to substitute retained counsel for appointed counsel, provided the substitution would not delay the trial. On the morning of trial, defendant asked to substitute counsel. The trial court denied defendant's request and thereafter obtained appointed counsel's assurance that he would vigorously represent defendant, and defendant's reluctant consent to proceed with the public defender. On the second day of trial, a private attorney, retained by defendant's friends, joined the defense.

We noted in *Friedman* that the decision to grant or deny a motion for continuance lies within the sound discretion of the trial court and that such a motion is considered in light of the diligence shown on the part of the movant. (*Friedman,* 79 Ill. 2d at 347.) We held in *Friedman* that the trial court could have reasonably concluded defendant's request was made solely for the purpose of delay. The same conclusion is warranted in this case.

Defendant could have substituted retained counsel at any point during the lengthy proceedings. Defendant was specifically advised by the court on March 26, 1987, approximately one month before the start of the sentencing hearing, that he could bring in retained counsel as co-counsel if he chose to do so. It was not until April 24 that Wagner appeared. The fact that defendant waited until

the commencement of sentencing to bring in Wagner, suggests delay as a significant factor in his decision.

Moreover, Wagner's unfamiliarity with the history and facts of the case was mitigated by the continued participation of King in the case. His thorough knowledge of preceding events was available to Wagner to draw upon. Finally, defendant fails to demonstrate how, if at all, he was prejudiced by denial of the continuance. Defendant's motion was properly denied.

Defendant next contends that the circuit court erred in admitting the testimony of an examining psychiatrist at the sentencing hearing, and that in so doing, the court denied him his constitutional rights. We disagree.

The psychiatrist in question, Dr. Kaplan, had examined defendant at defendant's request on two separate occasions, July 1, 1986, and April 14, 1987. During opening statements at the second phase of the death penalty hearing, defense counsel repeatedly referred to defendant as "feeble-minded" in an attempt to establish lack of intelligence as a mitigating factor. Defense counsel stated defendant's low IQ was obvious from defendant's actions and evasions as revealed through the testimony of the State's witnesses. The State countered by calling Dr. Kaplan, who testified defendant was possessed of average to "bright average" intelligence.

Relying upon *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, defendant claims his fifth and sixth amendment rights were violated in that he was not advised, prior to the examinations, of his *Miranda* rights, and his attorney was not apprised that his statements would later be used against him. In *Estelle*, the testifying psychiatrist, who had previously examined defendant at the court's request, described defendant's severe sociopathic condition and expressed the opinion that defendant's condition could not be remedied by treatment. Under the then-existing Texas capital sentencing

procedure, if the jury answered three questions in the affirmative, the judge was to impose the death sentence. One of these questions concerned the defendant's future dangerousness, an issue that the psychiatrist had, in effect, addressed. Defense counsel had apparently not been notified about the scope of the examination or even of its existence. Defendant did not receive the opportunity to discuss with counsel the examination or its scope. The psychiatrist's prognosis of defendant's future dangerousness was not based simply upon his observations of defendant, but on detailed descriptions of defendant's statements about the underlying crime. Given these facts, the Court held defendant's fifth and sixth amendment rights had been violated by admission of the psychiatric testimony.

The Court subsequently limited the breadth of *Estelle* to "the 'distinct circumstances' of that case" when it decided *Buchanan v. Kentucky* (1987), 483 U.S. 402, 97 L. Ed. 2d 336, 107 S. Ct. 2906. In *Buchanan*, defendant's attorney had joined in a motion for a psychiatric examination by a Dr. Lange and subsequently presented a "mental status" defense based, not upon Lange's report, but upon another psychological report and a letter in the custody of the Kentucky Department of Human Services. In rebuttal, the State offered Lange's report which set forth his general observations about defendant's mental state, but did not describe any statements by defendant pertaining to the charged offenses. Noting that defendant's counsel had himself requested Lange's psychiatric evaluation and had presumably consulted with petitioner about the nature of the examination, and that counsel had thereafter pursued a "mental status" defense, the Court in *Buchanan* concluded that counsel would have had to anticipate the use of psychological evidence by the prosecution in rebuttal.

The facts of the instant case are very similar to those in *Buchanan* and a similar result is warranted. Defense counsel requested both psychiatric examinations and presumably consulted with defendant beforehand. Dr. Kaplan did not describe any statements by defendant dealing with the offense charged, and defendant presented what was in effect a "mental status" defense in mitigation. Although defendant did not present his own psychiatric testimony, as was the case in *Buchanan*, we believe other similarities to *Buchanan* and the extensive representations of defense counsel during opening statement warranted the invited rebuttal the State employed here. See generally *People v. Silagy* (1984), 101 Ill. 2d 147, 174-75.

Defendant's next contention of error also concerns the second phase of the death penalty hearing. Defendant claims the prosecutor "inflamed and mislead [*sic*] the jury" when he stated defendant had raped the girl for whose murder defendant had been previously convicted. We find the prosecutor's argument in this respect unobjectionable. There was evidence that defendant employed subterfuge to lure Gladys Jones out of her apartment. Jones' body was later found in a closet in an abandoned building. Sperm was present in her vagina; a torn blouse and torn bra were found near the partially unclothed body. Given these facts, we believe it is logical to infer Jones had been raped before she was strangled. Defendant pled guilty to the murder of Gladys Jones. A prosecutor may argue any logical inference that can be drawn from the evidence. (*Collins*, 106 Ill. 2d at 277.) Proof of prior misconduct not resulting in prosecution or conviction is admissible as relevant to the question of defendant's character. (*People v. Johnson* (1986), 114 Ill. 2d 170, 190.) We find no error here.

Next, defendant asks us to reconsider certain constitutional challenges to our death penalty statute, all of which this court has previously rejected. The defendant argues

that the death penalty statute is unconstitutional because it does not require the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of the death penalty. This argument was rejected in *People v. Kubat* (1983), 94 Ill. 2d 437, and in *People v. Free* (1983), 94 Ill. 2d 378. Defendant has failed to present new arguments which would warrant reconsideration.

Defendant also argues that the death penalty statute is unconstitutional because it gives prosecutors unlimited discretion to choose which defendants will be subject to the death penalty and thus lacks adequate safeguards to prevent the arbitrary and capricious imposition of the death sentence. We have addressed those arguments on several occasions and have concluded that the statute satisfies constitutional guarantees. (See *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Erikson* (1987), 117 Ill. 2d 271, 304.) Defendant has not presented persuasive arguments warranting reversal of these decisions.

Defendant, citing *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837, contends that the death penalty statute violates the eighth and fourteenth amendments because it bars the sentencer from considering sympathy for defendant. We have considered similar challenges and have consistently rejected such attacks. See *People v. Phillips* (1989), 127 Ill. 2d 499, 543-44; *People v. Britz* (1988), 123 Ill. 2d 446, 479-80.

Finally, defendant contends that the death penalty statute is unconstitutional because it does not contain adequate safeguards to prevent the arbitrary and capricious imposition of the death sentence. Each of the factors defendant raises in support of this argument has been recently considered and rejected by this court in *Terrell* through application of established precedent. (*Terrell*, 132 Ill. 2d at 226-27.) We need not address them again here.

Defendant notes—and we are more than cognizant of the fact—that our death penalty statute has been declared unconstitutional by a United States district court judge in the Central District of Illinois (*United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246). That decision, of course, is not binding upon this court (*People v. Del Vecchio* (1989), 129 Ill. 2d 265, 296; *People v. Stansberry* (1971), 47 Ill. 2d 541, 544-45), and, in any event, has since been overturned (*United States ex rel. Silagy v. Peters* (7th Cir. May 2, 1990), Nos. 89—2129, 89—2212, 89—3117).

For the reasons stated above, we affirm the judgment of the circuit court of Cook County. The clerk of this court is directed to enter an order setting Wednesday, November 14, 1990, as the date on which the sentence of death entered by the circuit court shall be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A certified copy of this order shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the correctional institution wherein defendant is confined.

*Judgment affirmed.*