THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SUSAN PRATT, Defendant-Appellant.

Fifth District   No. 5—89—0678

Opinion filed May 14, 1991.

Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

William Haine, State's Attorney, of Edwardsville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, and Jean M. Henker, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

The defendant, Susan Pratt, was charged by indictment in Madison County with one count of aggravated battery to a child (Ill. Rev. Stat. 1987, ch. 38, par. 12—4.3) and four counts of cruelty to children

and others (Ill. Rev. Stat. 1987, ch. 23, par. 2368) based on injuries suffered by her infant twin daughters, Christina and Jessica. Defendant's husband, Bradley Pratt, was similarly charged. Following a bench trial on July 25-26, 1988, the trial court entered an order on June 14, 1989, finding defendant not guilty of aggravated battery and two counts of cruelty to children, and guilty of two counts of cruelty to children. Bradley Pratt was found guilty of all charges. On September 25, 1989, the trial court sentenced defendant to two concurrent two-year sentences of probation. Defendant appeals, contending that she was not proven guilty beyond a reasonable doubt.

The cruelty to children counts of which defendant was convicted charged, respectively, that defendant "wilfully and unnecessarily injured in health and limb Jessica Pratt, a child under her legal control, in that she failed to seek medical care for the injuries to the arm of Jessica Pratt" and "willfully [sic] and unnecessarily injured in health and limb Christina Pratt, a child under her legal control, in that she failed to seek medical care for the injuries to the head, torso and limbs of Christina Pratt." Defendant contends that she was not proven guilty where the evidence shows that she in fact sought medical care for Christina and Jessica and, additionally, that Jessica's health was not injured by any lack of care.

The record reveals that Christina Pratt and Jessica Pratt are twin girls born to defendant on January 9, 1987. At trial, defendant testified that she was 26 years old and that Christina and Jessica were her only children. Defendant had been unaware that she was carrying twins until she went into labor. The babies were delivered by Caesarean section and were five weeks premature. After bringing the babies home from the hospital, a routine developed where defendant would care for the children during the day while her husband worked, and after she went to bed, he would take care of the overnight feedings. Defendant stated that after caring for the babies all day, she was exhausted and slept "[l]ike a rock," never hearing her husband when he was up with the twins.

Defendant testified that she had never intentionally or accidentally harmed Christina or Jessica and had not seen her husband intentionally harm them, although he sometimes played a little roughly, swinging and "dipping" the babies. Bradley Pratt told defendant of two incidents where Christina was accidentally injured, once when she rolled off the couch and another time, shortly before her injuries were diagnosed, when he had stumbled and fallen with a full glass baby bottle, striking Christina in the head as she lay on the couch.

During January and February of 1987, defendant called or took the twins to their family physicians' office numerous times. Defendant stated that she came to believe that the staff at the doctors' office viewed her as an overanxious new mother. Doctors Raymond Weber and Stephen Staten, defendant's family physicians, testified that defendant called about problems with Christina's health six separate times from late January to mid-February and brought Christina to their office on January 27, February 6, 23, and 27. Dr. Weber testified that during the January 27 visit, defendant mentioned that Christina had rolled off the couch and that his nurse had noted a small bruise on the side of her face. Following a call to Dr. Weber on February 10, defendant took Christina to the hospital emergency room with flu symptoms. The doctors stated that defendant made three calls concerning Jessica during January and February, and that Jessica was seen at their office on February 5 and 6.

Defendant testified that on February 23 she asked Dr. Staten if Christina's head seemed misshapen. Defendant stated that she did not suspect that Christina had a head injury but simply believed Christina's head "looked funny." Defendant further testified that after telling this to Dr. Staten:

"[H]e said, [']well all babies aren't the same, you know.['] And I told him that I didn't mean to compare the children, because you're not supposed to do that, but she does not do the things that Jessica does. You know, she sleeps all the time. She throws up. She's just not right. Something is wrong with her."

Dr. Staten recalled that defendant complained about Christina's head, but could not remember if the complaint was made on February 23 or 27. Dr. Staten testified that he recorded any abnormalities he found, and though he did a head exam, nothing was noted for the February 23 visit, whereas on February 27 Christina's head injuries were apparent.

The twins' paternal grandmother, Sherry Garner, testified that after caring for the twins on Sunday, February 22, she advised defendant to take Christina to the doctor because she was listless, pale, and was "spitting up." Mrs. Garner also told defendant that she thought Christina's head seemed misshapen. Defendant took Christina to the doctor the next day.

On February 27, defendant started a new job while the twins' maternal grandmother, Gloria Berleman, baby-sat for them. Defendant testified that when she returned in the afternoon, she went to change Christina's diaper and discovered that she was drooling and "making funny movements." Defendant asked her mother to look at Christina,

and Mrs. Berleman agreed that something was wrong with the baby. They decided to call the doctor, and defendant took Christina to his office. Mrs. Berleman testified in substantial agreement with defendant and stated that she had not noticed any other problems with Christina that day.

Dr. Staten examined Christina on February 27 and noted that she looked grossly different than she had on the twenty-third. Christina's eyes were deviated to the left, and she was jerking her upper extremities back and forth, weighed five ounces less than on the twenty-third, and had a full fontanel, a symptom of brain injury. Dr. Staten testified that defendant told him the baby had been doing fine the previous day except for some excessive drooling. Dr. Staten noted several small bruises on Christina, including one under her right eye. According to Dr. Staten, defendant told him she had dropped a baby bottle on Christina's face two days earlier. With Dr. Weber's concurrence, Christina was transferred by ambulance to Cardinal Glennon Children's Hospital (Cardinal Glennon) in St. Louis.

Paramedics James Anderson and Robert Bowman transported Christina to that hospital. Mr. Anderson recalled hearing defendant say at the doctors' office that she had dropped a baby bottle on Christina. Mr. Bowman heard the remark but could not recall who had made it. Defendant denied telling anyone that she had dropped the bottle on Christina, stating that she had described her husband's report of dropping the bottle to Dr. Staten.

Emergency room pediatrician Dr. Katherine Bowen testified that she examined Christina at Cardinal Glennon on February 27. When she arrived, Christina was having seizures and had an enlarged head and sunken eyes, symptoms consistent with intracranial injury. Further examination revealed that Christina had several small bruises and had suffered retinal hemorrhages in both eyes. Christina was admitted to the neurosurgery intensive care unit. Dr. Bowen testified that the injuries she observed were consistent with child abuse and that some of Christina's injuries had occurred at different times. Dr. Bowen stated that the swelling in Christina's head would have occurred gradually, perhaps over the course of a week, and that vomiting could be a symptom of brain injury.

Pediatrician Dr. James Monteleone, chairman of the child protection management team at Cardinal Glennon, testified that he reviewed medical reports on Christina's condition. Christina was found to have one or possibly two skull fractures, a subdural hematoma, retinal hemorrhages, a suspected rib fracture, and a suspected hairline fracture or bone bruise of the left femur. Dr. Monteleone believed that

Christina's injuries indicated shaken infant syndrome, a form of child abuse, and that the various stages of healing indicated that the injuries had occurred over a period of up to one month. Dr. Monteleone stated that a child sustaining this type of head injury might exhibit no physiological symptoms other than convulsions, although vomiting was often a symptom. Dr. Monteleone "hoped" that a doctor receiving repeated complaints of vomiting would look for a health problem other than the stomach problems one would initially suspect.

Sheila Glaze, an emergency room social worker at Cardinal Glennon who evaluated cases of child abuse, testified that she interviewed defendant and her husband at the hospital on February 27. Ms. Glaze stated that defendant told her that she had dropped a bottle on Christina. Bradley Pratt told Ms. Glaze that he had once tripped over the cat while carrying the baby. Ms. Glaze described defendant and her husband as being upset about Christina's injuries and cooperative during their interviews.

After Christina had been admitted to Cardinal Glennon, it was requested that Jessica be brought in for examination. On March 1, 1987, Jessica was diagnosed as having healing fractures to her right humerus and left clavicle. The record indicates that Jessica had been seen by a Department of Children and Family Services (DCFS) worker on February 28, 1987, who reported that she had no outwardly observable injuries and displayed no signs of acute distress or pain. A radiologist reported to DCFS that the arm fracture was "very old." Doctors Monteleone and Bowen termed Jessica's injuries as being consistent with child abuse and agreed that the injuries were fairly old, i.e., more than two weeks. Defendant's presentence investigation report indicates that Jessica suffered no permanent injury as a result of her fractures.

Susan Redman, an investigator for DCFS, testified that she interviewed defendant and her husband several times in early March 1987 about the twins' injuries. Defendant was cooperative and reported to Ms. Redman that she had not seen Christina suffer any injuries. Defendant specifically denied having dropped a bottle on Christina herself, but stated that her husband had told her of Christina's falling off the couch and his tripping and hitting the baby with a bottle. Defendant told Ms. Redman that one morning in early February she had noticed Jessica favoring one arm and that it appeared swollen, so she and her husband asked a relative, who was an emergency medical technician, about the arm.

Mrs. Garner recalled that defendant had called her at work one morning and said that Jessica was favoring one arm. Defendant asked

Mrs. Garner to stop by and look at the baby. Mrs. Garner did not notice any redness or swelling, and Jessica was moving her arm. Mrs. Garner testified that she suspected a strained muscle or tendon because, although Jessica "was a little bit fussy," she was doing nothing to make Mrs. Garner believe there was something seriously wrong.

Bradley Pratt testified, denying that he had ever intentionally harmed his daughters. Christina had been injured twice while he was caring for her. When she was three or four weeks old, Christina fell off the couch while he was heating her formula, and two or three days before she was hospitalized, Christina was struck with his hand and a bottle when he tripped and fell on her as she lay on the couch. Christina seemed less active after the first incident. He told defendant about both accidents soon after they happened, and she took Christina to the doctor the day after Christina fell off the couch.

Bradley Pratt had once noticed Jessica favoring one arm, which showed some redness. He attributed the injury to his practice of wrapping her tightly in a blanket, which he had been told helped babies get to sleep. Mr. Pratt testified that he had called an uncle who was an emergency medical technician and he told Mr. Pratt the injury was probably a sprain. The redness went away after three days and Jessica had no further problems.

The trial court, in its June 14, 1989, judgment order, found defendant guilty of the cruelty to children counts involving failure to seek medical care for Christina and Jessica, stating, in part, as follows:

> "The statements of Bradley Pratt to the various witnesses amounts [sic] to an admission that the children were injured while in his care. The medical testimony indicated both children were victims of child abuse. Christina was taken to a doctor after Susan Pratt's mother noticed something was wrong with her on February 27, 1987, and Jessica was taken to Cardinal Glennon on March 1, 1987, for an examination after a suspected child abuse to Christina.

> Though there were several calls to Dr. Staten and Dr. Weber concerning the children by Susan Pratt, at no time did she mention any injuries to the children, nor were the children ever examined by the doctors at the request of the parents for any injuries to them."

Section 53 of "An Act to revise the law in relation of criminal jurisprudence" (Ill. Rev. Stat. 1987, ch. 23, par. 2368) provides:

> "Any person who shall wilfully and unnecessarily expose to the inclemency of the weather, or shall in any other manner in-

jure in health or limb, any child, apprentice or other person under his legal control, shall be guilty of a Class 4 felony."

■ In *People v. Miller* (1983), 116 Ill. App. 3d 361, 365, 452 N.E.2d 391, 394, the appellate court determined that the mental state which must be proved in order to sustain a conviction for cruelty to children is wilfulness. Thus, here, to be convicted of cruelty to children for failure to seek medical care, the evidence must have shown beyond a reasonable doubt that defendant's conduct "wilfully *** injure[d] in health or limb." Ill. Rev. Stat. 1987, ch. 23, par. 2368; see *Miller*, 116 Ill. App. 3d at 367, 452 N.E.2d at 395.

■ Section 4—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 4—5) specifically states that conduct performed knowingly is performed wilfully within the meaning of a statute using the latter term. When an offense is defined in terms of a particular result, a person is said to act knowingly when he is "consciously aware" that his conduct is "practically certain" to cause the result. (Ill. Rev. Stat. 1987, ch. 38, par. 4—5(b); *People v. Herr* (1980), 87 Ill. App. 3d 819, 821, 409 N.E.2d 442, 445.) Here, however, although the trial court found that defendant had not had Christina examined for injuries, the court did not find, and the evidence does not show, that defendant had specific knowledge of any particular injuries. Defendant had reported Christina's fall from the couch, her vomiting and the misshapenness of her head, and contrary to the trial court's findings, it was defendant, and not her mother, who first noticed a problem with Christina on February 27, 1987.

We agree with defendant that although Christina's injuries were severe when seen at the hospital, they had occurred over a period of time during which Christina had been seen by many people, including the family physicians, who did not realize she had a severe problem. The evidence shows that defendant was conscientious in seeking medical care for Christina. Therefore, any failure to seek care for a specific injury was not wilful, where it was not proven that defendant had knowledge, or was "consciously aware," that without additional medical treatment, injury was "practically certain" to occur.

As for defendant's actions with regard to Jessica, it is similarly apparent from the evidence that the decision not to seek medical attention was not based on any wilful attempt to injure the child. Defendant sought the advice of both her mother and a medically trained relative when she noticed Jessica favoring her arm. Where these family members proffered the view that any soreness Jessica displayed was no more than a strain or sprain, it is not unreasonable

for defendant to have believed that no medical attention was necessary.

However, even if the knowledge of Jessica's condition was sufficient to establish a failure by defendant to seek medical care, we find there is a lack of evidence showing defendant injured the child's health by not obtaining medical attention. According to the record, no treatment was required or appropriate when Jessica was taken to the hospital and there was no permanent injury. Therefore, no showing was made that the child's health was adversely affected by the failure to seek medical attention earlier. *Cf. People v. Berg* (1988), 171 Ill. App. 3d 316, 525 N.E.2d 573 (conviction for endangering minor by failure to seek prompt medical treatment was not supported by evidence absent showing that medical treatment was required or that child's health was endangered or adversely affected by failure to seek medical attention).

A reviewing court will not substitute its judgment for that of the trial court on questions of evidence and will not reverse a criminal conviction unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267; *People v. Stokes* (1989), 185 Ill. App. 3d 643, 659, 541 N.E.2d 1129, 1139.) However, when the record does not support the trial court's factual determinations, a court of review must reverse. (*Stokes*, 185 Ill. App. 3d at 659, 541 N.E.2d at 1139.) Here, there is insufficient evidence to support critical elements of the State's case. We therefore conclude defendant was not proved guilty of the charges beyond a reasonable doubt and consequently her conviction and sentence must be reversed.

For the foregoing reasons, the judgment of the circuit court of Madison County is reversed.

Reversed.

WELCH and HOWERTON, JJ., concur.