THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL RENTERIA, Defendant-Appellant.

First District (4th Division)   No. 1—91—0993

Opinion filed July 16, 1992.

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Dori Leo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a bench trial, defendant was convicted of aggravated battery of a child (Ill. Rev. Stat. 1989, ch. 38, par. 12—4.3(a)) and sentenced to six years' imprisonment. On appeal, defendant argues that his conviction should be reversed because the State's evidence was insufficient to prove him guilty beyond a reasonable doubt. In the alternative, defendant contends that he is entitled to a new sentencing hearing because the trial court erroneously applied amendments to the pertinent statutory provision (see Pub. Acts 86—575, 86—1003, effective January 1, 1990, amending Ill. Rev. Stat. 1989, ch. 38, par. 12—4.3(a)), that enhanced aggravated battery of a child from a Class 2 felony to a Class 1 felony and provided for a greater minimum term of imprisonment, although these amendments were not in effect at the time of the incident for which defendant was convicted. We affirm defendant's conviction, but vacate his sentence and remand for a new sentencing hearing.

Defendant was convicted for the aggravated battery of S.M. that allegedly occurred at approximately 10 p.m. on October 11, 1989, when S.M. was 2½ months old. It was undisputed at trial that at that time, defendant was 19 years of age and was living with the child's mother, B.M., in an apartment in Chicago. It was also undisputed that defendant was not the natural father of the baby.

Officer Joseph Lux of the Chicago police department testified that on October 13, 1989, he received a call from the Illinois Department of Children and Family Services reporting that S.M. had sustained injuries a few days earlier. Officer Lux went to the residence of defend-

ant and the child's mother and, in the presence of the mother, told defendant that he was investigating how the child was injured. Officer Lux testified that he posed to defendant a broad, general question regarding what had happened. According to Officer Lux, defendant told Lux that the child had fallen off the bed on the evening of October 11 at approximately 10 p.m. Officer Lux testified that defendant showed him the bed, which was standard sized and stood approximately 2½ to 3 feet high. The officer further testified that defendant informed him that defendant had left the child on the bed and gone into the kitchen area to get the baby's bottle, and that defendant then heard "something like a commotion" and discovered that the baby had rolled off the bed and onto the floor. Officer Lux stated that defendant told the officer that the child's mother had not been home at the time, but had gone to the store.

Officer Lux testified that thereafter, on October 25, 1989, he had a second conversation with defendant following defendant's admonition and waiver of his *Miranda* rights. Officer Lux stated that at this second conversation, defendant told the officer that the defendant "didn't do anything to hurt the child" and that he "didn't mean to hurt the child." Officer Lux testified that he told defendant that he did not believe him, because medical personnel reported the incident as a case of "shaken baby syndrome." Officer Lux stated that defendant then said that he had been getting the baby a bottle and that the baby would not stop crying. Defendant also told Officer Lux that the defendant was angry and frustrated about his job and his financial condition, and that "in anger he took it out on the child by picking the child up and shaking the kid hard." Officer Lux testified that defendant told him the baby had stopped breathing at one point, and that the defendant blew on the child's face. Officer Lux testified that he then placed defendant under arrest.

The State also presented the testimony of Dr. Mark Hershenson, who specializes in pediatric critical care and treated the baby following its admission to the hospital on the night of October 11, 1989. Dr. Hershenson testified that when he examined the child on October 12, the baby was comatose, had increased pressure in his brain from swelling, and had a bruise and swelling over the right eye. The physician testified that a computerized axial tomography scan (hereinafter CAT scan) revealed collections of blood in the back and on the left front side of the brain, as well as collections of blood between the two halves of the brain. Dr. Hershenson testified that the child's brain was extremely swollen on the complete left side and also on the right front of the brain. Dr. Hershenson also discovered one small skull

fracture at the back of the child's head, and testified that there might also have been a second small skull fracture at the back of the baby's head. The physician performed an ophthalmoligic exam that revealed bleeding in the back of the child's left eye.

Dr. Hershenson testified as an expert that, in his opinion and to a reasonable degree of medical certainty, the child suffered severe brain injuries that were the result of shaken baby syndrome. The physician based this diagnosis on three factors: (1) the CAT scan results, which showed bleeding in different areas of the brain as well as swelling of the brain; (2) the retinal hemorrhages, and the bleeding in the eye, which "most of the time means shaking"; and (3) the fact that the injuries were "way out of proportion" to the history given, *i.e.*, that the baby had rolled off the bed onto the floor. Dr. Hershenson stated that in his opinion and experience, the child's injuries would have required "extremely violent shaking, way out of proportion to anything that would be considered normal, such as a child swinging or a child moving in a car or even a resuscitative effort." Dr. Hershenson testified that a person who attempted to revive the child by shaking him would have had to undertake "extremely violent" shaking to cause the "very massive brain injuries" suffered by the child in the instant cause. Dr. Hershenson testified that in his opinion, within a reasonable degree of medical certainty, the child's skull fractures indicated that after the baby was shaken, it was "thrown against another object, be it the crib, or the bed, or the floor, or the wall, or something like that."

Dr. Hershenson also testified that in his experience and based upon pertinent literature within the field of pediatric critical care, it was his opinion to a reasonable degree of medical certainty that the child's injuries were not consistent with falling from a bed and that the injuries "could not occur from falling from a bed." The physician testified that in his experience, he had never seen similar or identical injuries caused by falling from a bed, nor did medical literature report such an occurrence. Dr. Hershenson stated that medical literature indicated that, in studies of babies who have fallen from hospital beds, only a very small percentage had fractures, and none of those children had the "severe brain bleeding and swelling that we see in this case." The doctor testified that the baby will probably be mentally retarded from the injuries, that he may suffer some seizures, and that there were also questions about whether the child could see and hear appropriately. Dr. Hershenson testified that the child's prognosis for a complete recovery of these conditions "would be most impossible."

In his defense, defendant presented the testimony of Dr. Demetra Soter, also a specialist in pediatric trauma and critical care. She testified that she had reviewed neither the results of the CAT scan nor the X rays taken of the child, but had reviewed only the reports of these procedures. Based upon her review of the reports of the X rays and CAT scan taken of the child, it was Dr. Soter's opinion that the child had not sustained any skull fractures, since none were explicitly mentioned in the CAT scan reports or the X-ray reports. Dr. Soter testified that the medical records indicated that the baby had sustained injuries causing abnormal swelling of the brain and retinal hemorrhaging. Dr. Soter testified that these conditions "all fit together with shaking baby syndrome" and that the "injuries fit with the child being vigorously shaken for whatever reason."

Dr. Soter defined "shaken baby syndrome" as a young child who "is vigorously shaken back and forth," which causes "the brain [to] bounce within the skull and the bridging vessels that go from the brain to the skull [to] tear because of the movement of the brain in the skull in separate directions." Dr. Soter demonstrated to the court the degree of shaking necessary to cause such injuries in a young child and characterized it as "significant." When asked to classify the degree of severity of the child's injuries in the instant cause in comparison to other cases of shaken baby syndrome observed by the physician during her career, Dr. Soter stated:

> "When he was brought in, he had already blown one pupil and had partially because of the swelling in his brain, pushed part of his brain out of the brain stem. His—one of his—one pupil was dilated. He was—he was quite—it was quite a severe injury. The next step would have been the second pupil blowing and death. So, he was in the top—top third of severity of shaking. *** Of brain injury."

Dr. Soter testified that, with regard to the degree of shaking necessary to cause such injuries, the "child would have to whip back and forth more than a few times to get up enough velocity to cause such brain damage." According to the physician, "[i]t wouldn't have to be over a minute or two, but a couple of seconds would probably be too short."

Defendant testified at trial that on the evening of October 11, 1989, he had gone with the child and its mother to the grandmother's home for dinner. Defendant stated that while at dinner, he had mentioned that he was starting a new job the following day and that he was excited about doing so. Upon returning to their own apartment at approximately 9:35 p.m., the baby's mother went to the local store

and defendant remained in the apartment to change the child's diapers. Defendant testified that he often participated in the baby's care, including diaper changing, washing of the child, and feeding, and he provided the funds necessary to support the baby and its mother.

Defendant stated that after changing the baby's diapers, defendant left the baby on the bed and went into the kitchen to get the child's bottle. Defendant stated that he heard a noise and loud crying, and discovered that the baby had rolled off the bed onto the floor.

Defendant stated that he ran into the bedroom and picked up the baby to see if he was all right, and placed the child back on the bed. Defendant testified that he saw that the baby was holding his breath and turning red, so he blew on and "lightly brushed" his hand over the baby's face. He then noticed that the child was turning blue and had stopped breathing entirely. Defendant stated that he became terrified that the child was going to die, and that the "only thing" he could "think of doing" was to "pick him up and shake him." Defendant testified that he picked up the child and shook him in order to have him start breathing again, and that the baby then began to breathe. Defendant stated that he went back to get the child's bottle and when he returned, the child had stopped crying and looked like he was in "a daze." Defendant testified that he noticed that the baby was not responding or moving his arms or legs. Defendant stated that he listened to the baby's heartbeat and that it was "much slower than a normal baby's heartbeat is." Defendant testified that he wrapped the child in a blanket and that, when the mother returned a few moments later, defendant told her that they would have to go to the hospital because the baby had fallen off the bed. Defendant stated that he remained at the hospital that night until approximately 5 to 7 a.m. the next morning.

Defendant testified that he spoke to Officer Lux a few days after the incident in the company of the child's mother. At that time, defendant told the officer that the child had fallen off the bed, that the baby stopped breathing, and that the defendant revived him. Defendant stated that he did not deny to the officer that he had shaken the baby.

On cross-examination, defendant acknowledged that he had been "angry because he [the baby] was not breathing." Defendant stated that he shook the child for "a matter of 3 or 4 seconds." Defendant testified that there had been instances in the past where the child had held his breath for a few seconds, and that the baby would do so because he became frustrated or angry while he was being changed. Defendant further said that, on these prior occasions, no one would

shake the child violently to revive him, and that the child was never taken to the hospital.

The child's mother, B.M., corroborated defendant's testimony regarding events preceding her departure from the apartment to go to the store. B.M. testified that when she returned, defendant told her that the baby had fallen from the bed and that he had to be taken to the hospital. B.M.'s mother also testified that defendant appeared to be in a good frame of mind that evening because he was starting a new job the next day. In addition, both B.M. and her mother testified that the defendant often undertook various aspects of the child's daily care, including changing the baby's diapers. They also confirmed that, in the past, the child had occasionally held his breath when the baby was angry, but that the child would resume breathing after a few seconds and never required special efforts to revive him.

Based upon this evidence, the trial court judge, sitting as finder of fact, determined that the State's evidence proved defendant guilty of aggravated battery of a child beyond a reasonable doubt. Following a hearing, the trial court sentenced defendant to six years' imprisonment. This appeal followed.

Defendant argues that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated battery of a child. Upon review, we must consider all of the evidence in the light most favorable to the State in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. It is not the function of a reviewing court to weigh the evidence or resolve conflicts in the evidence, nor to determine which witness provided more credible testimony. Rather, it is the fact finder's province to resolve conflicts, weigh the evidence, and draw reasonable inferences therefrom. On appeal, a defendant's criminal conviction should be vacated only if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781; *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

Aggravated battery of a child is defined as follows:

"Any person of the age 18 years and upwards who intentionally or knowingly, and without legal justification and by any means, causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years *** commits the offense of aggravated battery of a child." (Ill. Rev. Stat. 1989, ch. 38, par. 12—4.3(a).)

A person is considered to act intentionally "to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." (Ill. Rev. Stat. 1989, ch. 38, par. 4—4.) A person acts knowingly with respect to the result of his conduct "when he is consciously aware that such result is practically certain to be caused by his conduct." (Ill. Rev. Stat. 1989, ch. 38, par. 4—5(b); see *People v. Psichalinos* (1992), 229 Ill. App. 3d 1058; *People v. Pratt* (1991), 213 Ill. App. 3d 69, 571 N.E.2d 1190.) Both of these definitions are consistent with the rule that a defendant is presumed to intend the natural and probable consequences of his acts. See, *e.g., People v. Jackson* (1991), 145 Ill. 2d 43, 86-87, 582 N.E.2d 125.

On appeal, defendant acknowledges that he shook the child after it had fallen from the bed and had apparently stopped breathing. Defendant contends that he shook the child only briefly to revive the baby's breathing. Defendant argues that the State's evidence was insufficient because there was no testimony to establish that defendant intended or knew that his shaking the child would cause the baby to suffer great bodily harm or permanent disability. Defendant claims that his conduct was at most negligent or reckless.

Based upon our review of the record, and considering the evidence in the light most favorable to the State, we find sufficient evidence to support the fact finder's determination that the defendant intentionally or knowingly caused the child great bodily harm or permanent disability during the incident that occurred on October 11, 1989. Defendant acknowledged in his trial testimony that he shook the child when it had stopped breathing after the baby had apparently rolled off the bed and fallen on the floor. Officer Lux testified that defendant told the officer that the defendant had been angry about his job status and that defendant "took it out" on the child by "shaking the kid hard." Although the testimony of defendant, as well as the child's mother and grandmother, contradicted Officer Lux's testimony regarding defendant's frame of mind over his job status, it was the role of the fact finder to resolve this conflict. Moreover, defendant admitted at trial that he shook the child because he was "angry" that the baby would not stop crying. Consequently, there was sufficient evidence from which the finder of fact could have reasonably concluded that defendant did not shake the child simply to revive the baby's lapsed breathing.

With regard to whether defendant intended or knew that his shaking the child would cause the baby to sustain great bodily harm or permanent disability, we note that an accused's knowledge and in-

tent can be reasonably inferred from, and are often proved by, the circumstances surrounding the incident including the nature and degree of severity of the victim's injuries. (See, *e.g., People v. West* (1990), 137 Ill. 2d 558, 585-86, 560 N.E.2d 594; *People v. Flores* (1988), 168 Ill. App. 3d 284, 289, 522 N.E.2d 708.) Both Dr. Soter, the defendant's expert, and Dr. Hershenson, the State's expert, testified that the child had suffered shaken baby syndrome and had sustained massive brain injuries as well as retinal hemorrhaging. In addition, Dr. Soter specifically testified that the child here "had already blown one pupil" and that swelling in his brain had "partially *** pushed part of his brain out of the brain stem." Dr. Soter related that "it was quite a severe injury."

In addition, both of the physicians agreed that the child's severe brain injuries could only have been caused by shaking the child for more than a few seconds. Dr. Hershenson stated that the baby must have been "violently shaken" in order to cause the child's severe brain injuries. Dr. Soter testified that the baby's extensive injuries were caused by "significant" shaking, and stated that the "child would have to whip back and forth more than a few times to get up enough velosity to cause such brain damage."

Dr. Hershenson also testified that the child will probably be mentally retarded and that the prognosis for complete recovery is "most impossible." In addition, Dr. Hershenson testified that the child's skull fractures were probably caused by the baby having been shaken and then "thrown against another object," such as the crib, bed, floor, or wall. Although defendant's expert, Dr. Soter, testified that in her opinion the child had not suffered skull fractures, it was the province of the trial court, sitting as finder of fact, to resolve this conflict in the testimony.

The fact finder could also have found persuasive Dr. Hershenson's testimony that the child's severe brain injuries could not have resulted from efforts to resuscitate the baby once it had stopped breathing. Although defendant claims that Dr. Soter testified that brain injuries have resulted from misguided efforts to revive a child whose breathing has lapsed, the record does not indicate that Dr. Soter gave such testimony. According to the transcript, Dr. Soter testified at trial that she had encountered instances where persons had "claimed" that they had shaken the child in an effort to revive lapsed breathing. Dr. Soter did not testify that, in her medical experience, she had encountered an instance where injuries consistent with shaken baby syndrome had, in fact, been caused by efforts to revive a baby that had stopped breathing.

In light of these considerations, we are unable to accept defendant's claim that his conduct was reckless rather than intentional or knowing. In our view, the evidence of record was sufficient to support the fact finder's conclusion that the defendant violently shook the baby for more than a few seconds, that the defendant also then threw the child against an object, and that the defendant intended or knew that such acts would cause the child to suffer great bodily harm or permanent disability. In addition, the defendant's actions after the incident, where defendant checked the child's heartbeat, wrapped the child in a blanket, and immediately took the child to the hospital upon the mother's return, demonstrate that the defendant realized the injuries he had inflicted upon the child were so grave that the baby required emergency medical assistance. We find the State's evidence sufficient to prove the defendant guilty beyond a reasonable doubt of aggravated battery of a child. (See *People v. West* (1990), 137 Ill. 2d 558, 560 N.E.2d 594.) Accordingly, we affirm his conviction.

The defendant also argues that his sentence should be reversed and that he should receive a new sentencing hearing. Defendant contends that the trial court erroneously applied the amended statute that enhances the offense of aggravated battery of a child from a Class 2 felony to a Class 1 felony and increases the minimum term of imprisonment. (See Pub. Acts 86—575, 86—1003, effective January 1, 1990, amending Ill. Rev. Stat. 1989, ch. 38, par. 12—4.3(a).) The State confesses error in this point. Consequently, we vacate defendant's sentence and remand the matter for a new sentencing hearing.

Affirmed in part; vacated in part and remanded.

JIGANTI, P.J., and LINN, J., concur.