# ILLINOIS OFFICIAL REPORTS

*People v. Richardson*, 2013 IL App (1st) 111788

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JENISE RICHARDSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-1788 |
| Filed | November 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated battery of a child was reversed and the cause was remanded for a new trial where the trial court violated Supreme Court Rule 431(b) by failing to ask the prospective jurors if they understood that defendant did not have to prove her innocence, especially in view of the closely balanced evidence; furthermore, the court improperly restricted the questions defense counsel was allowed to ask prosecution witnesses about the circumstances surrounding defendant's signing of the statement she made that was placed in evidence by the State. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-7818; the Hon. Timothy Chambers, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Sarah L. Simpson, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion. Justice Pucinski concurred in the judgment and opinion. Justice Mason dissented, with opinion. |

**OPINION**

¶ 1    A jury found Jenise Richardson guilty of the aggravated battery of a child. In this appeal, Richardson contends that the trial court committed plain error by failing to ask the venire members whether they understood that the defendant had no burden of proving her innocence and the jury must not hold it against the defendant if she decides not to testify. Richardson also contends that the trial court improperly restricted cross-examination of prosecution witnesses about the circumstances under which Richardson signed the statement the prosecution put into evidence. Because we find both arguments meritorious, we reverse the conviction and remand for a new trial.

¶ 2                                    BACKGROUND

¶ 3    On January 12, 2007, Luenetha Crumb dropped off her children at the home of their babysitter, Richardson. When Luenetha retrieved the children, her seven-month-old son, Brandon Crumb, was crying. Richardson said Brandon had started fussing in the afternoon. Luenetha quieted Brandon down and Brandon stayed quiet on the ride home. Later that evening Brandon started crying inconsolably. Tylenol helped Brandon sleep through the night.

¶ 4    When Luenetha bathed Brandon the next morning, she noticed that he winced whenever she touched his leg. She took Brandon to his pediatrician, who ordered an X-ray. The X-ray showed a spiral fracture of the tibia, near Brandon's foot.

¶ 5    Luenetha called Richardson the next day and told her about the fracture. Richardson told Luenetha that Brandon had had no special problems at her home. Brandon's injury fully healed over the following weeks.

¶ 6    Detective Kathleen Moriarty arrested Richardson around 3 p.m. on March 28, 2007. Richardson discussed Brandon's injury with Moriarty. Moriarty then contacted Jaclyn Lantz,

an assistant State's Attorney, who interviewed Richardson around 8:30 p.m. Richardson told Lantz and Moriarty that she had done nothing wrong and she did not know how Brandon's leg broke. Richardson remained in lockup overnight.

¶ 7 Around 9 p.m. the next day, Lantz wrote out a statement Richardson signed. According to the handwritten statement, Richardson babysat the Crumb children during the day and other children at night during the week that began January 8, 2007. Every night that week, Richardson got home from the other family's home after 1:30 a.m. and woke up in time to take care of Luenetha's children, who arrived at 6 a.m. each morning. On January 12, 2007, Brandon slept in his car seat until 9:30 a.m., and he fell asleep again at 1 p.m. Richardson also napped in the afternoon until Brandon's crying awoke her around 3 p.m. Brandon refused a bottle and a pacifier and he kept crying.

¶ 8 The handwritten statement continues:

"[Richardson] says she placed her hands on [Brandon's] thigh area and started shaking him. *** [S]he had a strong grip on his legs and shook him for two minutes. *** [S]ometimes her hands move inward motion while shaking. [Richardson] says she was still tired and irritated because she had to get up at this point out of her sleep. *** [S]he now took the baby out of the car seat feet first, but by grabbing him by his waist. [She] says she did this in an aggressive way. *** [S]he was aggravated and did not take him out of the car seat the correct way. *** [A]s she was taking him out of the car seat, his foot twisted. *** [H]is foot twisted all the way around. *** [S]he knew Brandon was hurt, but did not know how bad. *** [S]he knew she hurt Brandon when she pulled him out of the car seat. *** [W]hen Brandon's mom called that day she did not tell Brandon's mom about his leg because she was scared and did not know how badly she hurt his leg."

¶ 9 Prosecutors charged Richardson with aggravated battery of a child. See 720 ILCS 5/12-4.3(a) (West 2006). The trial court denied Richardson's motions to quash the arrest and suppress the handwritten statement.

¶ 10 Before jury selection, the trial court said to the jury:

"[T]he defendant is presumed to be innocent of the charges against her. The presumption remains with her throughout the trial and is not overcome unless by your verdict you find the State has proven her guilty beyond a reasonable doubt.

Is there anyone here who has any quarrel with the proposition of law, the presumption of innocence? If so, raise your hand.

No hands have been raised.

*** The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the trial.

Does anyone have any quarrel with this proposition of law, the burden of proof? If so, raise your hand.

Again, no response.

The defendant is not required to prove her innocence.

Does anyone have any issues with that proposition?

Again, no response.

-3-

And, finally, the defendant has an absolute right to remain silent and to elect to sit here and not testify in her defense and rely on the presumption of innocence. You may draw no inference from the fact that the defendant chooses to remain silent either in favor or against the defendant because she elects to remain silent.

Does anyone here have any quarrel with this proposition of law, the right of the defendant to remain silent?

Again, no response."

¶ 11    No one objected to the court's questions.

¶ 12    At the trial, the doctor who saw Brandon's X-ray explained that the spiral fracture must have resulted from twisting the leg. Children usually do not sustain spiral leg fractures before they can walk. Luenetha testified that Brandon had not begun to walk before January 12, 2007.

¶ 13    Dr. Scott French, an emergency physician, estimated that about 3% of his patients are younger than two years old. In his opinion, Brandon's injury resulted from child abuse. Because the fracture occurred so near Brandon's foot, Dr. French concluded that the abuser most likely applied force to Brandon's foot, not his leg. The spiral fracture resulted from either twisting the body with the foot fixed in place, or twisting the foot with the body stationary. Dr. French admitted that a doctor from Children's Memorial Hospital reported that "a child in a walker could at seven months old *** generate sufficient force to cause the spiral fracture that was seen on [Brandon's X-ray]." The Children's Memorial doctor reported that he could not conclude that Brandon's injury resulted from child abuse. Defense counsel asked Dr. French why his hospital sought an opinion from a doctor at Children's Memorial Hospital. The trial court sustained the prosecutor's objection to that question, and to defense counsel's question about what kind of doctor at Children's Memorial held the opinion that the injuries might not have resulted from child abuse.

¶ 14    Detective Moriarty recounted the circumstances that led to the handwritten statement. On cross-examination, defense counsel asked why Moriarty did not give Richardson pen and paper and let her write out her own statement. The trial court sustained the prosecutor's objection. Counsel asked whether Richardson had any opportunity to write out in her own words what happened. The trial court sustained the prosecutor's objection. Counsel asked whether the police station had equipment for videorecording statements. The trial court sustained the prosecutor's objection. Counsel asked whether police videorecorded Richardson's statement. The trial court sustained the prosecutor's objection and added, "that's done in homicide cases." The court did not explain that police could offer a suspect for any crime the option of having his or her statement videorecorded.

¶ 15    Lantz read into evidence the statement she wrote out that Richardson signed. Defense counsel cross-examined Lantz about the exact wording of the statement and elicited Lantz's admission that Richardson never said she intended to hurt Brandon or that she hurt him deliberately. Lantz admitted that she never asked Richardson whether the foot twisted accidentally. On redirect, the prosecutor elicited Lantz's testimony that she wrote down what Richardson said and permitted Richardson to correct the statement Lantz wrote.

¶ 16    On re-cross-examination, Lantz admitted that the handwritten statement did not include,

word for word, everything Richardson said. The transcript of the trial shows the following questions from defense counsel, and trial court rulings:

"Q. Are there means by which everything she said could have been captured?

[Prosecutor]: Objection: beyond the scope.

THE COURT: I'll sustain that.

BY [Defense counsel]:

Q. Well, was this statement videotaped?

[Prosecutor]: Objection.

THE COURT: I'll sustain that.

* * *

Q. Do they have videotape capability in that room?

[Prosecutor]: Objection.

THE COURT: Counsel, I've sustained the objection."

¶ 17    The court instructed the jurors, in accord with the pattern instructions:

"You have before you evidence that the defendant made a statement relating to the offenses charged in the indictment. It is for you to determine whether the defendant made the statement and, if so, what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

¶ 18    The jury found Richardson guilty of aggravated battery of a child. In her posttrial motion, Richardson argued that the court erred by disallowing cross-examination of prosecution witnesses on the available means of taking a statement from Richardson. The trial court sentenced her to eight years in prison. Richardson now appeals.

¶ 19                                    ANALYSIS

¶ 20    Richardson raises two issues on appeal: (1) Did the trial court commit reversible error in its questioning of the venire? and (2) Did the trial court commit reversible error by sustaining the prosecutor's objections to questions about the circumstances under which Richardson signed the handwritten statement?

¶ 21                              Questioning the Venire

¶ 22    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires the trial court to ask potential jurors whether they understand and accept specified principles concerning the State's burden in criminal prosecutions. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). Richardson contends that the trial court violated the rule when the judge asked the venire only whether they had "any quarrel with" the specified principles, without asking whether they understood the principles. Because defense counsel did not object to the questions, we review the issue only for plain error. *Thompson*, 238 Ill. 2d at 611.

¶ 23    The State argues that the trial court's questions comported with the rule, so the trial court

committed no error. Our supreme court clarified the meaning of Rule 431(b) in *People v. Wilmington*, 2013 IL 112938. The trial court in that case asked the venire members whether they "disagree[d]" with the principles specified in the rule. *Wilmington*, 2013 IL 112938, ¶ 28. Our supreme court said:

> "As this court stated in *Thompson*, Rule 431(b) requires that the trial court ask potential jurors whether they *understand* and *accept* the enumerated principles, mandating 'a specific question and response process.' *Thompson*, 238 Ill. 2d at 607. While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself." (Emphases in original.) *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 24       The State does not suggest any significant difference between the questions here and the questions in *Wilmington*. Following *Wilmington*, we find that the trial court's inquiry here violated Rule 431(b). Due to the error, the trial court may have permitted a juror to decide the case even though the juror may not have understood the principles that jurors must presume the defendant innocent and that the defendant has no obligation to testify or offer any evidence on her own behalf. See *People v. Zehr*, 103 Ill. 2d 472 (1984).

¶ 25       We will reverse the judgment under the plain error doctrine if either "(1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Wilmington*, 2013 IL 112938, ¶ 31. Richardson does not contend that the error challenged the integrity of the judicial process. Instead, she contends that the error threatened to tip the balance in this case with closely balanced evidence.

¶ 26       At trial, Richardson did not contest the State's argument that the injury occurred on January 12, 2007, during the time Richardson had responsibility for taking care of Brandon. The jury needed to decide only whether Richardson knowingly caused great bodily harm to Brandon. See 720 ILCS 5/12-4.3(a) (West 2006).

¶ 27       Dr. French, who testified for the prosecution, found that the injury resulted from child abuse. He said the abuser must have twisted the foot while the body stayed still or the abuser twisted the body while the foot held still. In his opinion the injury most likely resulted from force applied to the foot. According to Lantz, Richardson confessed to shaking Brandon while holding his thighs. Dr. French's testimony leads to the conclusion that Richardson's shaking of Brandon while holding him by his thighs did not cause the fracture near his foot. The signed statement relates to the injury only insofar as, in Lantz's words, Richardson admitted to pulling Brandon out of the child seat "in an aggressive way," and as she pulled him, his foot twisted. Even in Lantz's words, Richardson did not say she intended to twist Brandon's foot or that she knew the foot would twist and the twisting would cause great bodily harm.

¶ 28       Moreover, the State relied heavily on the opinion of Dr. French, an emergency room physician, who lacked the special qualifications of an orthopedist or a pediatrician. Dr. French admitted that only 3% of his practice involved children as young as Brandon. Dr.

French admitted that a doctor at Children's Memorial Hospital reported that he could not determine whether the injury resulted from child abuse, as children Brandon's age can move themselves with enough force to cause an injury like the injury Brandon suffered. Dr. French did not testify that the injury could not have resulted from negligence. Neither party asked Dr. French whether a person might have injured Brandon by lifting him out of the car seat in an improper manner without intending to hurt him.

¶ 29     The statement Lantz wrote indicates only that Richardson knew after she pulled Brandon out of the car seat that she had hurt him. Nothing in the statement indicates that, before she picked up Brandon, she knew that pulling Brandon from the car seat would injure him. The dissent maintains that Richardson's irritation with Brandon's crying and her failure to tell Luenetha about the injury strongly support the conviction. But irritation might well have led to a negligent act rather than deliberate harm. Fear, and hope that the injury would not prove severe, could have caused Richardson not to tell Luenetha about the injury, even if Richardson injured Brandon accidentally.

¶ 30     To obtain the conviction, the State relied on Dr. French's testimony, the statement Richardson signed, and Richardson's admission that she did not immediately tell Luenetha about Brandon's injury. Dr. French, who lacked the qualifications of a pediatrician or an orthopedist, never said that Richardson intended to harm Brandon or that she must have known before she took Brandon out of the car seat that she would injure him. The statement Richardson signed does not say she intended to harm Brandon or that she knew before she took Brandon out of the car seat that she would injure him. The jury faced the difficult task of resolving a very close question of whether the evidence showed that Richardson knew, before she pulled Brandon out of the car seat, that by so doing she would cause him great bodily harm.

¶ 31     The dissent maintains that the majority substitutes its opinion for the jury's finding. *Infra* ¶ 52. But the jury's verdict does not address the question of whether the evidence in Richardson's favor closely balances against the evidence for the prosecution. The dissent seeks to ensure that no properly admonished jury ever gets the chance to hear the evidence in this case. Instead, the dissent would substitute its own finding concerning the evidence for the finding of a properly admonished jury.

¶ 32     The standard the dissent uses for finding the evidence not closely balanced amounts to nothing more than a finding of sufficient evidence to support the conviction. The sufficiency standard nullifies our supreme court's direction that in cases with closely balanced evidence, an error in Rule 431(b) admonishments requires a remand for retrial. *Wilmington*, 2013 IL 112938, ¶ 31. If the prosecution did not present sufficient evidence to support the conviction, this court would have a duty to reverse the conviction outright without remand for a new trial. *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 33     Because the jury needed to resolve a close issue of whether the evidence in this case proves that Richardson acted with intent to injure Brandon, or with knowledge that her acts would injure Brandon, we find the evidence of aggravated battery closely balanced. Richardson chose not to testify. The trial court's error in questioning the venire left open the possibility that a juror who did not understand the fundamental principles restated in Rule

431(b) might have resolved the close question on an improper basis. Jurors might not have understood the counterintuitive principle that, even after prosecutors file charges against a defendant, they must presume the defendant innocent, and they must not treat Richardson's decision not to testify as evidence of guilt. See *People v. Alexander*, 396 Ill. App. 3d 563, 585 (2009) (McDade, J., concurring in part and dissenting in part). The error in questioning the venire might have tipped the scales of justice against Richardson in this closely balanced case. Accordingly, we reverse the judgment and remand the case for a new trial.

¶ 34                                Cross-examination

¶ 35    To obviate the need for a remand to this court if the supreme court should disagree with our judgment on the issue of the venire questions, we will also address Richardson's argument that the trial court committed reversible error in its restrictions on the questions concerning other possible means of taking a statement from Richardson, and the prosecution's choice to use the method that gave the assistant State's Attorney control over the words of the statement and prevented the jury from seeing Richardson's demeanor at the time she gave her statement. We review decisions concerning the scope of cross-examination for abuse of discretion. *People v. Kliner*, 185 Ill. 2d 81, 130 (1998).

¶ 36    The trial court should admit evidence concerning the circumstances of the defendant's confession, including evidence concerning the method used to take a statement. 725 ILCS 5/114-11(f) (West 2010); *People v. Buck*, 361 Ill. App. 3d 923, 944-45 (2005). All of the questions at issue concerned the available methods for taking a statement. The State argues that the questions at issue posed to Assistant State's Attorney Lantz on re-cross-examination exceeded the scope of the redirect examination, and the questions at issue posed to Detective Moriarty bore no relevance to the case.

¶ 37    On the redirect questioning of Lantz, the prosecution tried to bolster the credibility of the statement Lantz wrote by eliciting Lantz's testimony that she summarized Richardson's statement accurately and permitted Richardson to make any corrections she chose. On re-cross-examination, defense counsel elicited Lantz's concession that she did not record exactly every word Richardson said. Defense counsel's further questions concerned two available methods that would permit the jury to see or hear Richardson's own words, rather than Lantz's version of those words. Lantz could have offered to videorecord Richardson's statement, or she could have let Richardson write out in her own words what happened. See *People v. Moreira*, 378 Ill. App. 3d 120, 123 (2007); *People v. McGee*, 326 Ill. App. 3d 165, 167 (2001); 20 ILCS 3930/7.2(a) (West 2006) ("law enforcement agencies may choose to electronically record interviews of suspects for offenses other than first degree murder if they adopt local protocols in cooperation with the local State's Attorney's office"). The evidence the court excluded would have shown that Lantz did not offer Richardson available alternatives that would have recorded Richardson's words more accurately. Instead, Lantz used only the method that gave Lantz the most control over the wording of the statement. We find that defense counsel's questions concerning Lantz's method of taking Richardson's statement responded to the redirect examination. See *People v. Smith*, 241 Ill. App. 3d 365, 380-81 (1992) (trial court correctly permitted questions on recross to impeach testimony

given on redirect); *People v. Miller*, 58 Ill. App. 3d 156, 161 (1978) (a party has a right to examine a witness about matters brought out by the opposing party on the preceding examination). The trial court misapplied the rules of evidence and thus abused its discretion when it prevented the jury from learning about the available alternative methods for taking a statement from Richardson as part of the relevant circumstances of the statement. See *People v. Davis*, 70 Ill. App. 3d 454, 458 (1979).

¶ 38     Defense counsel similarly sought to question Detective Moriarty about the circumstances in which she obtained a statement from Richardson. Again, counsel sought to establish that Moriarty did not use, and did not give Richardson the option of using, available alternative methods for recording Richardson's statement more accurately. We agree with Richardson that the court abused its discretion by excluding this relevant, admissible evidence concerning the method used to record Richardson's confession. See Ill. R. Evid. 611(b) (eff. Jan. 1, 2011). The court's rulings on defense counsel's questions ensured that jurors would not hear all the relevant evidence concerning the circumstances under which Richardson made her statement. The court instructed the jurors to "consider all of the circumstances under which" Richardson signed the statement, but the court's ruling left the jurors without the evidence needed to fully understand those circumstances. See Illinois Pattern Jury Instructions, Criminal, No. 3.06-07 (3d ed. 1992).

¶ 39     Because of the closely balanced evidence in this case, and the prosecution's reliance on the statement Lantz wrote as its principal proof of Richardson's guilt, we find that Richardson suffered prejudice from the improper restrictions on the cross-examination of Moriarty and the re-cross-examination of Lantz. Thus, if our supreme court finds the error in the questioning of the venire insufficient to warrant reversal, we would find that the improper restrictions on defense counsel's questions require reversal of the conviction.

¶ 40                                    CONCLUSION

¶ 41     The trial court did not ask the venire members whether they understood the fundamental principles of criminal justice as required by Rule 431(b). In this case, with closely balanced evidence, we find that the trial court's plain error requires reversal of the conviction. We also find that the improper restrictions on the questions defense counsel asked prosecution witnesses require reversal of the conviction. Because Richardson does not contest the sufficiency of the evidence, we remand for a new trial.

¶ 42     Reversed and remanded.

¶ 43     JUSTICE MASON, dissenting.

¶ 44     I agree with the majority that under *People v. Wilmington*, 2013 IL 112938, the trial court's questioning of the venire in this case failed to conform to the requirements of Illinois Supreme Court Rule 431(b) and that in the absence of an objection to the admonishments to the jury, a plain error analysis is warranted. *Wilmington* indicates that errors in Rule 431(b) admonishments are not structural errors under the second plain error prong absent evidence

of actual juror bias and, therefore, will prompt reversal only when the reviewing court concludes that the evidence in the case was closely balanced. *Id.* ¶¶ 33-34. There is no suggestion in this case of actual juror bias. The majority concludes, however, that the evidence here was closely balanced and, therefore, the error in questioning jurors may have tipped the balance against Richardson. Based upon my review of the record, I must respectfully disagree.

¶ 45    In support of its conclusion regarding the closely balanced nature of the evidence, the majority cites the cross-examination of Dr. Scott French, the emergency room physician who examined seven-month-old Brandon and who, without objection, was qualified as an expert in the fields of emergency medicine and child abuse. In Dr. French's report, he mentions a consultation with Dr. Dan Leonhart of Children's Memorial Hospital. (It is not clear from Dr. French's report that Dr. Leonhart actually saw the victim.) According to the report, Dr. Leonhart, based on the information available to him, could not say that Brandon's injuries were the result of child abuse. As of March 2, 2007, in Dr. Leonhart's view, it was possible that Brandon's injury could have been sustained while he was in a walker at the babysitter's the morning of the injury, which would have rendered him "somewhat ambulatory."

¶ 46    In my view, nothing in the foregoing testimony renders the evidence in this case closely balanced. Dr. Leonhart did not testify at trial and he was consulted prior to the date Richardson admitted to police that she knew she hurt Brandon while he was in her care and in a manner that had nothing to do with him being in a walker. According to Richardson, she hurt Brandon when she handled him aggressively during the afternoon. She said nothing about Brandon being in a walker. The jury also heard uncontradicted testimony from Brandon's mother that when she placed Brandon in a walker at home, he could not move. Thus, Dr. Leonhart's observation that Brandon could have been injured while in a walker is irrelevant in light of the foregoing evidence.

¶ 47    The issue presented to the jury was whether, given Richardson's admission to injuring Brandon,[1] she did so with the requisite mental state to support a conviction for aggravated battery of a child, *i.e.*, whether she "intentionally" or "knowingly" caused great bodily harm to Brandon. 720 ILCS 5/12-4.3(a) (West 2006). Dr. Leonhart was clearly not commenting on Richardson's state of mind since, as of March 2, 2007, Richardson had not been identified as the perpetrator. Further, the jury was given the option, at the request of defense counsel, of finding Richardson guilty of the lesser included offense of reckless conduct (720 ILCS 5/12-5(a) (West 2006)), but it declined to do so.

¶ 48    There was ample evidence presented at trial to support the State's burden of proof both regarding the manner in which Brandon was injured and as to Richardson's state of mind. Both Dr. French and Dr. Sheila Major, a radiologist with substantial experience in reading X-rays of injuries to children under the age of two, testified that a spiral fracture of the type sustained by the victim raises a "red flag" for child abuse in children who are not ambulatory. Spiral fractures in nonambulatory children are rare because a child who is not walking is

---

[1]Richardson does not challenge on appeal the denial of her motion to suppress her confession.

generally unable to create on his own sufficient force to cause such an injury. A spiral fracture requires a fixed point, such as the foot, and a twisting force sufficient to break the bone. Given the lack of swelling at the time Brandon was brought to the emergency room, it was also apparent that the injury was of recent origin. Based on the evidence regarding the amount of force required to produce a spiral fracture, the rarity of such injuries in nonambulatory children, and the undisputed evidence that Brandon was, in fact, nonambulatory and was injured while he was in Richardson's care, the jury had a sufficient basis upon which to conclude that Brandon's injury was the product of intentional conduct. See *People v. Renteria*, 232 Ill. App. 3d 409, 416-17 (1992) (medical evidence and nature of injury to infant sufficient to sustain conviction for aggravated battery notwithstanding defendant's denial that he intended to hurt the child or acted with knowledge that his conduct created a strong probability of great bodily harm). Indeed, the jury could have done so without any explanation from Richardson as to the manner in which she claimed the injury was caused.

¶ 49    In her statement, Richardson admitted that on the date Brandon was injured, she both twisted his thigh by rubbing it between her hands in opposite directions and pulled him out of his car seat in a manner that caused his foot to catch in the cloth covering and turn all the way around. She also admitted that at the time she handled Brandon in this manner, she was aggravated that Brandon would not stop crying. The only issue for the jury, assuming it believed Richardson's account of how the injury occurred, was whether Richardson acted knowingly as required under the statute.

¶ 50    Richardson's statement does not admit that she intended to injure Brandon or that she did so deliberately. She was thus free to argue to the jury, as her counsel did, that the injury was accidental.

¶ 51    But there was more than sufficient evidence for a jury to conclude that Richardson acted with the requisite intent. On the date of the injury, despite her knowledge that she had hurt Brandon, she denied to Brandon's mother, concerned over the infant's crying when she came to pick him up, that anything had happened during the day. The next day, after the fracture was discovered, Richardson again denied to Brandon's mother that anything had happened while the baby was in her care. Once the police were able to locate her (made difficult, perhaps intentionally, by her move and the changing of her phone number), Richardson repeated her denial that she was responsible for the injury.

¶ 52    A jury could have concluded, as Richardson's counsel argued, that her persistent and repeated denials were the product of fear and that she was simply afraid to admit that she had accidentally injured the child, or, as it evidently did, the jury could have found that if the injury to the victim was truly accidental, Richardson would not have gone to such great lengths to deny her role and simply would have admitted that Brandon's foot caught in the fabric of his car seat when she picked him up, if, in fact, that is the way the injury occurred. The majority's observation that "irritation might well have led to a negligent act rather than deliberate harm" mirrors the argument that Richardson's counsel made to the jury. *Supra* ¶ 29. The jury rejected this argument and we should not substitute our judgment for theirs. *Renteria*, 232 Ill. App. 3d at 415. My examination of the record leads me to conclude that nothing in the trial court's questioning of the venire tipped the balance against Richardson.

-11-

¶ 53    I also cannot agree that the trial court's restriction of defense counsel's cross-examination provides any basis for reversal. Defense counsel's questioning of Assistant State's Attorney Lantz on re-cross-examination regarding alternative means of memorializing Richardson's confession was beyond the scope of redirect examination. Thus, it was within the trial court's discretion to preclude examination into those matters. *People v. Franklin*, 135 Ill. 2d 78, 97 (1990). Although defense counsel's questioning of Detective Moriarty on the same topic was not beyond the scope of direct examination and should, therefore, have been allowed, the error in this regard was harmless. Defense counsel made the point in his examination of both Lantz and Moriarty that Richardson's confession was not a verbatim account. For example, the following exchange took place in defense counsel's re-cross-examination of Lantz:

"Q. Mam [*sic*], when you say summary, you mean this statement is not everything Jenise said?

A. It was a summary of everything she said.

Q. Does it include everything she said?

A. Not word for word. *** I asked her questions and she responded and I wrote down what she said.

* * *

We spoke for a significant amount of time. I can't write every word. It was a summary of what she said and anything she wanted added that was missing we added."

Although counsel was not permitted to ask Lantz or Moriarty whether Richardson could have been provided pen and paper to write her own statement or whether the statement could have been recorded, it would have been obvious to any reasonable juror that the statement was neither written by Richardson nor videotaped.[2] Furthermore, because Richardson does not admit in her statement that she knowingly or intentionally hurt Brandon, the fact that her statement could have been memorialized in different ways does not bear on the only issue the jury was called upon to decide: her mental state.

¶ 54    Defense counsel's closing argument also made the point that Richardson had not admitted that she intended to hurt Brandon: "The best they can do, they get some buzzwords in the statement, irritated, angry, aggressive, they put those things in there, and Jenise signed it. Are those Jenise's words or are those the words that they wrote down. You know they wrote them down." It was only after counsel again attempted to argue that Richardson was not allowed to write her own statement or have it videotaped that the State's objection was sustained. Defense counsel also failed to present evidence or argue that any of the other circumstances surrounding Richardson's statement–the length of her detention, where and under what conditions she was held, her lack of experience with the police or criminal

_____

[2]In my view the trial court could properly have restricted cross-examination regarding videotaping in any event given that the presumption against use of statements that are not electronically recorded only applies in homicide prosecutions. 725 ILCS 5/103-2.1 (West 2006). Thus, because there was no requirement that Richardson's confession be videotaped in order to introduce it at trial, the fact that it could have been is irrelevant.

matters–bore on its reliability or trustworthiness.

¶ 55    Therefore, this is not a case where, as the majority finds, Richardson was precluded from presenting a viable defense based upon the manner in which her statement was taken. Richardson's counsel was permitted to and did argue to the jury that it should give little weight to her statement because it was not in Richardson's own words and that Lantz inserted "buzz words" that were designed to prejudice Richardson. Nothing in the trial court's restriction of cross-examination diluted this argument, which was ultimately rejected by the jury.

¶ 56    I would affirm.