THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRELL BROCKMAN, Defendant-Appellant.

Fifth District   No. 5—91—0615

Opinion filed March 31, 1994.

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

After a jury trial, defendant, Darrell Brockman, was convicted of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)), armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2), and aggravated

battery (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(a)). Defendant was sentenced to serve consecutive 30-year prison terms on the armed violence and armed robbery convictions. No judgment was entered on the aggravated battery verdict, as it was deemed to be a lesser-included offense of armed violence. Defendant appeals his convictions and raises the following three issues: (1) whether defendant was denied a fair trial because (a) defendant did not voluntarily waive his right to counsel, (b) the trial court failed to rule on the merits of defendant's claim that his current counsel was ineffective and refused to consider appointing new counsel, (c) trial counsel was ineffective in that he failed to interview two alibi witnesses and failed to certify that defendant planned to present an alibi defense at trial, and (d) the trial court forced defendant to trial *pro se* with the use of standby counsel immediately following the denial of defendant's motion to dismiss without giving defendant the opportunity to prepare his defense; (2) whether the trial court erred in failing to instruct the jury on the limited use to be made of defendant's prior convictions for forgery and robbery; and (3) whether defendant was denied his right to have his interests represented when the court communicated with the jury about the case, where neither the *pro se* defendant nor standby counsel was consulted about a note from the deliberating jury to the trial court before the trial court answered the jury's inquiry. We affirm.

Defendant was charged by information with armed robbery, armed violence, and aggravated battery in connection with the stabbing of Paul Braun on December 26, 1990. An assistant public defender was appointed as defendant's attorney. On March 18, 1991, the trial was continued on defendant's motion until the April docket. The State did not object to this continuance. On April 9, defendant again filed a motion to continue, which was granted. The State did not object. On April 22, defendant sent a letter to the trial court asserting his innocence and complaining that he could not see his public defender when necessary. On May 10, 1991, the trial was again continued, this time on the State's motion without objection by defendant.

On June 21, 1991, both the State and the defense announced ready for trial. The case was then called for trial on June 26, 1991.

On the day trial was scheduled to begin, defendant's public defender explained to the trial court that he and defendant had reached an impasse and that defendant was no longer communicating with him. He stated that defendant told him the Sunday before trial that he sent a letter to the court complaining about his services and requesting a new lawyer be assigned. The public defender thought

that because of the impasse, he could not provide defendant with effective representation and asked that he be allowed to withdraw from the case. The trial court then questioned defendant, who agreed that he was not satisfied with his representation and stated that he did not have money to hire private counsel. The trial court then asked defendant "Well, are you expecting this court to appoint you another Public Defender and if you don't like that one, to appoint another one and on and on?" Defendant answered "No" and explained that he wanted an attorney who would get things done such as talking to the necessary witnesses. The prosecutor objected on the basis that there was ample opportunity prior to the day the trial was to start for defendant to discern that he had a problem with his public defender and that defense counsel's motion to withdraw should be disallowed without further showing of prejudice. The public defender then stated his belief that if he was to proceed as defendant's counsel, defendant would receive inadequate court representation. The trial court stated that there was no indication that defendant would cooperate with another public defender, but asked defendant whether he would accept a substitute public defender, and defendant stated he would. The prosecutor then interjected that the trial court would be setting bad precedent by allowing a defendant to come in on the day of trial and request a different public defender. The prosecutor opined that it would slow down the system and not allow the court to complete its business. Without further discussion about defendant's specific complaints about his lawyer, the trial court denied the motion to withdraw. The public defender then told the trial court that he did not believe he would be getting any assistance from his client concerning the defense of the matter. As a result, the trial court asked defendant if he wanted to represent himself and have the court appoint the public defender as a consultant. Defendant stated that would be acceptable. The following discussion then ensued:

"THE COURT: Do you want to proceed that way?

THE DEFENDANT: I don't have any choice.

THE COURT: That is right. Well, you have a choice. You can cooperate with [the public defender] or not. If you are not going to cooperate with him, then you will represent yourself, but I will make him and appoint him as an advisor to you and he will be available during the proceedings, during the motion to suppress, during this jury selection, during the trial if you want to ask him any questions, but you'll be handling it all yourself unless you choose to communicate with him. It is up to you.

You say you don't want to communicate with him, that is fine. He will be here and he will be available if you want to communi-

cate with him. You have to get these witnesses in, you know, this afternoon. Are you prepared to do that?

THE DEFENDANT: No.

THE COURT: Well, then, we will proceed on the motion to suppress. If you don't produce any witnesses, then obviously your chances of winning the motion to suppress aren't very great, are they?

THE DEFENDANT: The thing about it, Your Honor, is being at the County Jail, you can't do anything over there. When you are trying to get something done, the only way you can call out over there is to make collect phone calls and some people have blocks on their phones. You can't get who you need to talk to and it is just a lost cause to that individual when you are trying to get the attorney to do things for you when he is not getting it all done for you."

Nevertheless, the trial court set the hearing on the motion to suppress for 2 p.m. and directed defendant to have his witnesses ready. At the time of the hearing, defendant stated that after consulting with his lawyer, he wanted to withdraw the motion to suppress the lineup and begin jury selection.

The jury was selected and opening statements were made. After defendant concluded his opening statement, the State requested an in-chambers hearing to object to the use of an alibi defense, as that defense had not been certified prior to trial. Defendant explained that he told his lawyer the names of several alibi witnesses prior to the start of trial. The public defender agreed that defendant gave him the names of alibi witnesses, two of whom he interviewed; however, for unspecified ethical reasons he decided not to call either as a witness. He did not talk to Larry Parker or Stanley Ray, both of whom defendant claimed could be alibi witnesses. He also agreed that he did not make defendant aware of the fact that an alibi defense had to be certified prior to the start of trial. The State complained that it could not respond to the alibi defense when the only information on addresses the defendant could supply was that the witnesses stayed on 57th or 58th Street. The court stated:

"Unless the defendant is willing to give more information, based upon the information that he has put on the record here in regard to any witnesses, I am not going to allow any witnesses to testify because he hasn't furnished sufficient information to allow the State to investigate. But I am going to allow him to testify as to the alibi on the basis that I don't think he should be held under these circumstances to certify an alibi defense in advance as a pro se defendant."

The defendant furnished no further information either in terms of

where the individuals lived or in terms of what their testimony would be. Ultimately, the trial court ruled defendant could testify to his alibi defense, subject to hearsay objections, but could not present alibi witnesses because he did not furnish "sufficient information to allow the State to investigate."

Paul Braun, the victim, testified about the stabbing. Braun resides in Smithton and is a self-employed accountant. He is married with two children and is president of the East St. Louis Development Corporation (Corporation), which rehabs existing homes in East St. Louis to rent to low- to moderate-income individuals. In the two months before the incident in question, defendant did some work for the corporation. On the morning of December 26, 1990, defendant and a colleague were scheduled to meet with the victim and Father Stallings at 9:30 a.m. regarding trash removal from a house scheduled to be rehabbed. Only defendant appeared. According to Braun, he gave defendant $50 to haul trash to the dump. Plans were then made to meet at 1 p.m. at the house to discuss further cleanup. Braun and Father Stallings went to the house as scheduled, but no one was there. It was apparent that no one had been there because no cleanup was done. About 2 p.m., defendant returned to Braun's office and asked for more money, but Braun refused because no work was done, and defendant did not have a receipt from the dump. A few minutes later, two unidentified men came into Braun's office and stated that defendant owed them money and they wanted to know why Braun did not pay defendant. Braun explained the situation and the two left.

About 3:50 p.m., Braun was getting ready to leave for the day when he discovered his car had a flat tire. After he changed the tire, defendant walked up and asked Braun to give him a ride home. Braun agreed and the two left together. When en route, defendant changed his mind and instead asked to be taken to his girl friend's house. When they arrived, defendant told Braun to look to his left. When he did so, defendant stabbed Braun on the right side of his neck with a knife with a four- to six-inch blade and red handle. According to Braun, defendant then stabbed him a second time, leaving a gash on the left side of his forehead. Braun struggled to get the knife away from defendant. When Braun got some control over the knife, he opened the car door and ran down the street. He came to a house and banged on the door to get help. Defendant followed Braun, and the two struggled again. This time, Braun was stabbed in the forearm. Braun threw his wallet so defendant would have to leave him to pick it up. Defendant picked up the wallet and attempted to leave by going through the backyard. A resident of the house came

out and told defendant that he could not exit the way he was going, so defendant went in the opposite direction and apparently took Braun's car.

Braun was hospitalized for five days. He identified defendant in a lineup at the county jail about two weeks after the attack. Braun's wallet was found in the car, which was recovered approximately one week after his release from the hospital. Braun testified that upon the wallet's return, it was missing $3, an Amoco credit card and a telephone credit card. Braun's Amoco statement from the following month included charges made two hours after the attack and up to two or three days later. An investigator for the State's Attorney's office testified that most of the purchases were for snacks and cigarettes. The parties stipulated that the signatures on the Amoco receipts were compared with exemplars of defendant's handwriting by local crime lab technicians. Experts at the lab found general similarities between the signatures, but were unable to positively conclude that defendant signed the receipts.

Residents of the house where defendant and Braun allegedly struggled also testified for the State. Charlene Loveless testified that in the late afternoon of December 26, 1990, a scuffle between a black man and Braun occurred in her carport area. Braun had blood all over him. Charlene was unable to get a good look at the black man and could not identify defendant as the perpetrator. Charlene called the police and her sister-in-law, Leona London, wrapped towels around Braun's wounds. Charlene asked the victim where he lived, and he replied that he lived in Smithton. Charlene asked Braun why he was in the area and he stated he was taking defendant to his girl friend's home. Braun told her defendant took his car, but Charlene did not see a car in the area. Leona London corroborated Charlene's testimony.

Reginald Loveless, Charlene's son, testified that he saw two men fighting and heard the black man demand money from the white man, who was struggling to get away. The black man had a pocket knife with a three- to four-inch blade. Reginald was the one who told the black man he could not exit in the rear. The black man then went over a gate at the front of the house and jumped into a car parked on 72nd Street with the motor running and the driver's door open. Reginald could not identify defendant as the black man that he saw that day because he only got a glimpse of the black man.

Defendant took the stand in his own defense after he was advised that if he chose to testify, his credibility would be impeached with his two prior convictions for forgery and one conviction for robbery. Defendant testified in narrative form that he was 41 years old and that

when he met Braun the morning of December 26, 1990, Braun gave him $70 rather than $50. Defendant explained $40 was for the dumping fee, $10 was for gasoline, and $20 was for defendant to arrange for Braun to meet with a prostitute later in the day. Defendant alleged he previously arranged such a meeting for Braun, but the meeting never took place. According to defendant, he made such arrangements for men like Braun who wanted "something different" sexually. Defendant stated that he gave Braun a receipt for dumping, but agreed there was a dispute about the condition of the house that was to be cleaned. Defendant also agreed he left with Braun that day, but testified that Braun dropped him off at 57th Street, where a prostitute was waiting as arranged. Braun left with the prostitute. Defendant did not know what happened to Braun after he departed with the prostitute, but speculated that Braun held him responsible for his ordeal because he made the arrangements.

On rebuttal, Braun denied defendant had ever arranged for him to meet with a prostitute and denied defendant's allegations about what occurred on December 26, 1990.

A jury instruction conference was held at which time defendant's attorney stated he reviewed the State's proposed instructions with defendant. Defendant made no objections to the State's instructions and tendered none of his own. During jury deliberations, the jury sent a note to the court seeking the testimony of Reginald Loveless. The court signed the note and wrote "No." The transcript reveals no discussions about the note sent by the jury.

After defendant was convicted and judgment was entered, the public defender was appointed to represent defendant at his sentencing hearing at defendant's request. On July 9, 1991, he filed a post-trial motion which alleged, *inter alia*, that the trial court erred in not instructing the jury regarding the limitations on use of defendant's prior convictions. Defendant also filed a *pro se* post-trial motion in which he alleged error due to being forced to represent himself without the time or the opportunity to prepare his defense and give the required notice of an alibi defense to the State. Both post-trial motions were denied. Defendant was sentenced as previously set forth.

■ The first issue is defendant's claim that he was deprived of a fair trial by the trial court's rulings on his request for new counsel and by his original counsel's ineffectiveness. As his first subpoint, defendant contends that he did not voluntarily waive his right to counsel and is, therefore, entitled to a new trial. While we may feel that the better procedure for trial courts to follow when faced with situations similar to the instant case would be fully admonishing de-

fendant under Supreme Court Rule 401 (134 Ill. 2d R. 401), we are cognizant of the cases which hold that the full panoply of waiver warnings is unnecessary when standby counsel is afforded. (*People v. Nieves* (1982), 92 Ill. 2d 452, 442 N.E.2d 228; *People v. Hite* (1983), 115 Ill. App. 3d 66, 450 N.E.2d 416.) Since original counsel continued to assist defendant in his role as standby counsel, we find no error in the trial court's procedure.

■ Defendant's second subpoint on his first issue, the trial court's failure to rule on the alleged ineffectiveness of his counsel, can be merged with his third subpoint, the claim of ineffectiveness based on counsel's failure to interview two of the four alibi witnesses, and counsel's failure to certify that defendant planned to present an alibi defense at trial. We conclude that even if the trial court had explicitly ruled on these contentions, it would have concluded they were without merit under the circumstances of this case. Our reasons for this conclusion are threefold. First, we note that trial counsel had interviewed two of the alibi witnesses, and he concluded that he could not ethically present their testimony. Taking such a position does not constitute ineffective assistance of counsel. Second, counsel's failure to interview the other two witnesses was not what caused their testimony to be excluded. Rather, it was the defendant's failure to afford the State some meaningful location of these witnesses that eventually led the trial court to exclude them. In addition, we note that nowhere in the record does defendant indicate the nature of their purported testimony in any detail. Third, the failure of counsel to certify the alibi defense did not result in its bar. The trial court allowed defendant to testify about the fact that he was not at the scene of the crime. Therefore, we conclude that the trial court would have properly determined that defendant's claims were without merit and that, assuming for the purposes of argument that counsel was ineffective, defendant was unable to meet the second prong of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

■ On defendant's final subpoint on his first issue, forcing him to trial, we conclude that it is without merit. While defendant claims that it was error to force him to trial without an opportunity to prepare, we note the following facts. Both parties had answered ready only a few days before the trial date. Defendant had the assistance of standby counsel throughout the proceedings. Defendant points to no specific evidence or witness that he was unable to produce. Defendant points to nothing in the record to establish that he requested a continuance of the trial. Under circumstances such as we presented in this case, trial courts must be granted a great deal of discretion. *People v. Went* (1990), 137 Ill. 2d 558, 560 N.E.2d 594.

■ Defendant's second major issue involves his claim that his conviction should be reversed because the trial court did not instruct the jury on the limited use of the evidence of his prior convictions. Defendant admits that he did not tender an instruction on this point, and we conclude that the trial court did not err in failing to *sua sponte* instruct the jury on this point. *People v. Layhew* (1990), 139 Ill. 2d 476, 564 N.E.2d 1232, *People v. Turner* (1989), 128 Ill. 2d 540, 539 N.E.2d 1196; *People v. Mondhink* (1990), 194 Ill. App. 3d 806, 551 N.E.2d 755.

■ Defendant's final point is that he was denied his right to have his interests represented when the trial court communicated with the jury and neither he nor standby counsel was consulted about a note from the jury before the court answered the jury's question. The question was, "Can we have the testimony of Reginald Loveless [*sic*]?" The court wrote "No" in response to the request. Defendant contends this ruling was error and that it was compounded by the fact that neither he nor his standby counsel was informed of the jury's communication. While we do not approve of the trial court's communication with the jury without notifying counsel, we conclude that no reversible error occurred in this case. Clearly, the court has the discretion to deny a jury's request for a portion of the transcript. (*People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577), and defendant has shown no abuse of the court's discretion in its ruling in this case. While defendant contends that reading Loveless' testimony would have been beneficial because Loveless was unable to identify him, the State replies that the testimony would have helped it because Loveless saw no prostitute in the car and her absence militated against defendant's theory. Under these circumstances, we conclude that there was no error in the court's communication. See *People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577.

For the foregoing reasons we affirm the defendant's convictions.

Affirmed.

LEWIS, P.J., and GOLDENHERSH, J., concur.